229 F.3d 177 (2nd Cir. 2000)
 UNITED STATES OF AMERICA, Appellee,
v.
XAVIER CARRILLO, JULIO BENIQUEZ, ANGEL OCASIO, aka Titi, ARNOLD RODRIGUEZ, aka Chino, TEO JOHNSON, JOSE SERRANO, aka Shorty, LAWRENCE MATHIES, aka Poochie, CLARENCE JACKSON, aka Boo Boo, JAMES WIGGINS, aka Jimmy Long, aka Jim Bob, JULIO CARRILLO, MARQUEO STROUD, WILLIAM OCASIO, PAUL VIERA, aka Paulie, KELVIN LYONS, aka Peanut, DANIEL SANTIAGO, KENNETH LYONS, aka Kenny, JEROME JEMISON, aka Sal, aka Slick, ALVIN FUSTER, OSCAR DOMINGUEZ, EDGAR MALDONADO, aka Kojak, ANDREW RODRIGUEZ, aka "Andy," Defendants,
RONALD OCASIO, Defendant-Appellant.
 Docket No. 98-1499
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: November 22, 1999
Decided: September 29, 2000
 
 Appeal from judgment of conviction imposed upon Ocasio by the United States District Court for the Southern District of New York (Batts, J.) pursuant to 18 U.S.C. §§ 2, 924(c), 1959(a)(1), 1959(a)(5), 1962(c), 1962(d), and 21 U.S.C. § 846, for participation in a racketeering enterprise, conspiracy to participate in a racketeering enterprise, murder for the purpose of maintaining position in a racketeering enterprise, attempted murder and conspiracy to murder for the purpose of maintaining position in a racketeering enterprise, conspiracy to distribute heroin and cocaine base, and using and carrying firearms during and in relation to several of the above listed crimes of violence. The Court of Appeals (Leval, J.) affirms the judgment.
 BRUCE R. BRYAN, Syracuse, N.Y., for Appellant.
 ROBIN BAKER, Assistant United States Attorney, Southern District of New York, New York, NY (Mary Jo White, United States Attorney for the Southern District of New York, New York, NY.), for Appellee.
 Before: LEVAL, CALABRESI, and PARKER, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 Defendant Ronald Ocasio was convicted, following a ten-week jury trial, of violations of the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1961-1968, and the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959. The counts of conviction included: (1) participating in the conduct of a racketeering enterprise in violation of 18 U.S.C. § 1962(c) by committing the predicate racketeering acts of murder, attempted murder, conspiracy to commit murder, and narcotics trafficking; (2) conspiring to conduct and participate in the affairs of a racketeering enterprise in violation of 18 U.S.C. § 1962(d); (3) conspiracy to murder Kelvin Lyons and Joseph Hendrickson for the purpose of maintaining position in a racketeering enterprise in violation of 18 U.S.C. § 1959(a)(5); (4) attempted murder of Lyons, in violation of 18 U.S.C. §§ 1959(a)(5) and 2; (5) murder of Rufus Brown, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (6) conspiracy to murder Robert Antonetti, in violation of 18 U.S.C. § 1959(a)(5); (7) murder of Robert Antonetti, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (8) conspiracy to murder Axel Antonetti, in violation of 18 U.S.C. § 1959(a)(5); (9) murder of Axel Antonetti, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; (10) conspiracy to distribute and possess with intent to distribute heroin and cocaine base, in violation of 21 U.S.C. § 846; (11) using and carrying a firearm during and in relation to the conspiracy to murder Lyons and Hendrickson, the attempted murder of Lyons, and the murder of Brown, in violation of 18 U.S.C. §§ 924(c) and 2; (12) using and carrying a firearm during and in relation to the conspiracy to murder and the murder of Robert Antonetti, in violation of 18 U.S.C. §§ 924(c) and 2; and (13) using and carrying a firearm during and in relation to the conspiracy to murder and the murder of Axel Antonetti, in violation of 18 U.S.C. §§ 924(c) and 2. The district court (Batts, J.) sentenced Ocasio to life imprisonment and a consecutive term of forty-five years' imprisonment, to be followed by a five-year term of supervised release, and a mandatory 650 dollar special assessment.
 
 
 2
 On appeal, Ocasio contends that (1) the district court erred in refusing to charge that in order to find that he had committed the racketeering act or VICAR act of conspiracy to murder, the jury must find that a member of the conspiracy had committed an overt act in furtherance of the conspiracy; (2) insufficient evidence supported the finding that he had committed certain racketeering acts; (3) the government failed to disclose information in a timely manner and this failure denied him a fair trial; (4) the manner in which the case was prosecuted denied him due process; (5) the district court erred in refusing to give the defense's requested instructions regarding witness credibility; (6) the jury instructions omitted some of the overt acts listed in the original indictment's drug conspiracy count; (7) he received ineffective assistance of counsel; (8) the government violated 18 U.S.C. §201(c)(2) by making promises of value to witnesses in exchange for testimony; (9) the government proved multiple conspiracies rather than the conspiracy charged, and the court erred by failing to give a multiple conspiracy charge; and (10) the district court unreasonably restricted the defense's cross-examination of witnesses. We reject Ocasio's contentions and affirm the judgment of conviction. His contentions numbered (2) through (10) above are insubstantial and require no discussion. We reject his first contention for the reasons given below.
 
 BACKGROUND
 
 3
 The evidence at the trial demonstrated that Ocasio was the leader of a racketeering enterprise known as the "Bryant Boys," so named because its drug distribution operations were centered at 850 and 860 Bryant Avenue, Bronx, New York. Cooperating co-defendants who had been involved in the Bryant Boys enterprise, as well as other witnesses, including law enforcement officers, testified to the organization and history of the enterprise's heroin and crack distribution operation, and to Ocasio's role in it. The Bryant Boys began operating as early as 1987 by selling heroin in glassine bags in front of 860 Bryant Avenue. As their operation expanded, the Bryant Boys began selling crack cocaine as well, and began selling from inside an abandoned building at 850 Bryant Avenue. The building was known as "the Hole" because its courtyard was surrounded by a high wall, and all of its windows were covered over, leaving open only a small hole in one wall through which drugs and money could be passed. By early 1991, the Bryant Boys sold drugs at these "spots" twenty-four hours a day, seven days a week, in eight-hour shifts. In each eight-hour shift, they sold approximately 350 bundles of heroin, containing ten glassine bags per bundle, and approximately 140 packs of crack cocaine, each containing 50 vials of crack.
 
 
 4
 Sometime in 1990, Rudolph Wyatt, who had worked as a hitman for the Bryant Boys at Ocasio's direction, got into an argument and physical altercation with Angel Ocasio, the defendant's brother. On October 21, 1990, the defendant Ocasio told Arnold Rodriguez to call Wyatt and ask him to come to Bryant Avenue. Rodriguez did so, and Wyatt, accompanied by Carl Norris and Cartrell Campbell, met Rodriguez across the street from 860 Bryant Avenue. They began to approach the building. Ocasio and his two brothers, William and Angel, then came out of the building, and Ocasio tossed a bag to Wyatt. As Wyatt opened the bag, Ocasio drew a gun and shot him. At the same time, William and Angel Ocasio drew their own guns and began shooting at and pursuing Norris and Campbell. In the ensuing confusion, Wyatt, though wounded, escaped into a nearby restaurant. Later, Ocasio caught up to Norris and shot and killed him; two witnesses observed the shooting from their window. Physical evidence collected at the scene and statements of others in the neighborhood corroborated the eyewitness accounts of the shootings.
 
 
 5
 The "spots" closed for a brief period in 1992 due to a battle for control of the drug-selling turf between Ocasio and Xavier Carrillo. The battle was precipitated when Manny Burgos, Carrillo's nephew, attempted to open his own heroin-selling operation across the street from 860 Bryant, and Ocasio had Burgos murdered. When the battle ended, Ocasio was left in sole control of the Bryant Boys. Although Ocasio was jailed in 1993 for attempted bribery in connection with his trial in state court for the murder of Carl Norris, his brother Angel took charge of the Bryant Boys, and defendant Ocasio continued to instruct members of the Bryant Boys from jail. The "spots" closed briefly in 1994, when the Bryant Boys found themselves in a number of gun battles with the Nasty Boys, a rival drug gang.
 
 
 6
 After the murder of Burgos, Ocasio was shot at while entering his home, and Ocasio concluded that the attack was Carrillo's response - he believed Carrillo had hired Kelvin Lyons and Joseph Hendrickson to kill him, and that Lyons or Hendrickson had fired the shot. In fact, Carrillo had enlisted Lyons in an effort to have Ocasio and other members of the Bryant Boys killed after the Burgos murder. Lyons, in turn, suspected Ocasio and Jose Serrano of trying to kill him, and hired Hendrickson in an attempt to kill Serrano. Thereafter, Ocasio enlisted members of the Bryant Boys to kill Lyons and Hendrickson, among others.
 
 
 7
 By Thanksgiving Day of 1992, Lyons was no longer a member of the Bryant Boys and instead was operating his own crack selling "spot," where he employed Rufus Brown. On that Thanksgiving Day, while Lyons and Brown were walking from Lyons's "spot" on Seneca Avenue to a taxi stand, several of Ocasio's henchmen, including Serrano, watching from the roof of 860 Bryant Avenue, recognized Lyons, and mistook Brown for Hendrickson. They ran downstairs and told Ocasio they had seen Lyons. Ocasio then armed himself with a handgun, gave Serrano another handgun, and went with the entire group to the building's basement, where they could peek out onto Seneca Avenue through a fire door. At Ocasio's direction, Serrano peeked outside, and reported that he saw Lyons and Hendrickson (who was really Brown). Roland Montes, another member of the group, then volunteered to shoot, and took Serrano's gun. With Montes, Ocasio ran into the street and shot and killed Brown (believing he was Hendrickson), while Montes shot at Lyons but failed to kill him. The government's cooperating witnesses testified to these events, and their testimony was corroborated by the observations of the law enforcement officers who later arrived at the scene, as well as by the bullets found in Brown's body.
 
 
 8
 After Ocasio gained sole control of the Bryant Boys and reopened the Bryant Boys' drug selling "spots" in 1992, the Bryant Boys retained Axel Antonetti to work the overnight shift selling drugs. Subsequently, Axel Antonetti's brother, Robert Antonetti, began robbing the Bryant Boys and their customers of money and drugs. As a result, Ocasio hired Len Saunders to kill Robert Antonetti, and told him to use Teo Johnson as his lookout. Using Johnson as lookout, Saunders then killed Robert Antonetti.
 
 
 9
 Soon afterwards, Ocasio fired Axel Antonetti. Bryant Boys' workers and customers thereafter began complaining that Axel Antonetti was robbing them. Ocasio then hired Saunders to kill Axel Antonetti. Again, Ocasio told Saunders to use Johnson as a lookout, and Arnold Rodriguez gave Saunders a handgun to use for the killing. Saunders then shot and killed Axel Antonetti, and Ocasio later paid Saunders. At that time, Saunders stated that he had shot Antonetti repeatedly, and ballistics and medical evidence corroborated this account.
 
 Events at Trial
 
 10
 When the district court was ready to formulate its instructions to the jury regarding Ocasio's racketeering acts and VICAR acts consisting of conspiracy to murder, Ocasio's counsel requested that the court charge as follows:
 
 
 11
 If you are satisfied that a conspiracy at issue did exist, and second, that Mr. Ocasio was a member of the conspiracy charged, then you must determine whether one of the members of the conspiracy took some affirmative step in furtherance of the conspiracy to achieve the object of the conspiracy during the life of the conspiracy. This is what we call an overt act.
 
 
 12
 Now, an overt act is any step, action or conduct which is taken to achieve, accomplish or further the objects of the conspiracy committed by one or more of the co-conspirators.
 
 
 13
 . . .
 
 
 14
 The overt act may be by itself an innocent act, like a phone call. It may not be a criminal act at all. On the other hand, the overt act may be the crime which was the object of the conspiracy . . . . For the government to satisfy the overt act requirement, it is required only to prove beyond a reasonable doubt that either Mr. Ocasio or one of his alleged co-conspirators knowingly committed an overt act in furtherance of the conspiracy.
 
 
 15
 In this regard, counsel's request distinguished the racketeering acts and VICAR counts of murder conspiracy from those of drug conspiracy, pointing out that conviction of the federal crime of conspiracy to distribute narcotics does not require that a member of the conspiracy committed an overt act in furtherance of the conspiracy, while conviction of the New York State crime of conspiracy to murder does require that one of the conspirators committed an overt act in furtherance of the conspiracy. Compare N.Y. Penal Law § 105.20 ("A person shall not be convicted of conspiracy unless an overt act is alleged and proved to have been committed by one of the conspirators in furtherance of the conspiracy."), with United States v. Shabani, 513 U.S. 10, 15 (1994) ("In order to establish a violation of 21 U.S.C. § 846 [federal controlled substances conspiracy statute], the Government need not prove the commission of any overt acts in furtherance of the conspiracy.") and United States v. Bermudez, 526 F.2d 89, 94 (2d Cir. 1975) ("[P]roof of an overt act is not a necessary element of a conspiracy charged under 21 U.S.C. § 846 . . . . [C]onspiracy to distribute narcotics is in and of itself a specific crime.") (internal quotation marks and citations omitted).
 
 
 16
 Nevertheless, the district court declined to charge the jury that in order to find that the defendant had committed the racketeering act or VICAR act of conspiracy to murder, it would have to find that a member of the conspiracy had committed an overt act in furtherance of the conspiracy. The court reasoned that because an indictment need not list the state law elements of racketeering acts that in combination constitute a RICO offense, see, e.g., United States v. Orena, 32 F.3d 704, 714 (2d Cir. 1994) (holding that indictment charging violations of 18 U.S.C. §§ 1959 and 1962 need not allege overt act as element of racketeering act or VICAR act of conspiracy), the charge to the jury need not list the state law elements of the constituent racketeering acts.
 
 
 17
 The district court ultimately charged the jury that to find that the defendant committed a racketeering act consisting of either conspiracy to murder or conspiracy to distribute narcotics, or a VICAR act of conspiracy to murder, the jury must find "that two or more persons entered an unlawful agreement or understanding, which objective was to violate provisions of the law" and "that the defendant knowingly and willfully became a member of each conspiracy, that is, that he knowingly associated himself and participated in the alleged conspiracy." When the jury returned with its verdict, it found Ocasio guilty of all racketeering acts charged in connection with both racketeering counts of the indictment-participating in the conduct of a racketeering enterprise and conspiring to conduct and participate in the affairs of a racketeering enterprise. In addition, the jury found Ocasio guilty of the VICAR acts. The acts included: conspiracy to murder Rudolph Wyatt and attempted murder of Rudolph Wyatt, conspiracy to murder Kelvin Lyons and attempted murder of Kelvin Lyons, conspiracy to murder Joseph Hendrickson and murder of Rufus Brown (who was believed to be Hendrickson), conspiracy to murder Robert Antonetti and murder of Robert Antonetti, and conspiracy to murder Axel Antonetti and murder of Axel Antonetti.
 
 DISCUSSION
 
 18
 Ocasio contends that reversal of certain counts is required because of the district court's failure to give the requested charge on the need for an overt act to prove conspiracy under New York State law. The Government, in response, argues that in a RICO prosecution, the court need not charge each element of the state law crimes constituting the predicate racketeering acts. Rather, generic definitions of the crimes suffice. The government relies primarily on two authorities. In United States v. Bagaric, 706 F.2d 42, 62 (2d Cir. 1983), abrogated on other grounds by National Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994), defendants appealed from a RICO conviction, and complained that the jury had not been instructed on the elements of the state law crime charged as the racketeering act. We rejected the claim. We ruled that "[u]nder RICO . . . state offenses are included by generic designation," and that "[r]eferences to state law serve [merely] a definitional purpose, to identify generally the kind of activity made illegal by the federal statute." Id. (citations, internal quotations, and alterations omitted; emphasis added). We therefore concluded that the district court was not required to charge the jury on the state law elements of the offenses constituting the predicate racketeering acts of murder, arson, and extortion, and that "[a]ccurate generic definitions of the crimes charged were sufficient." Id. at 63. More recently, in United States v. Diaz, 176 F.3d 52 (2d Cir. 1999), a defendant challenged his conviction under the VICAR portion of RICO for conspiracy to assault, complaining that one of the state law elements of conspiracy was the commission of an "overt act" in furtherance of the conspiracy by a member of the conspiracy and that the evidence was insufficient to prove this element. See id. at 96. We rejected his contention, noting that the evidence was ample, and also stated, relying on United States v. Miller, 116 F.3d 641, 675 (2d Cir. 1997) (citing Bagaric), that "RICO's allusion to state crimes was not intended to incorporate elements of state crimes, but only to provide a general substantive frame of reference" and that "the government [was] not required to prove an 'overt act.'" 176 F.3d at 96.
 
 
 19
 At oral argument, the government relied on United States v. Coonan, 938 F.2d 1553 (2d Cir. 1991), where we addressed the question whether a RICO prosecution could be based on a predicate act when the defendant had already been acquitted of the state law crime constituted by the alleged act in state court, so that the defendant could not have been charged again with the same conduct under the law of New York State. We concluded that the prior acquittal did not bar the RICO prosecution because RICO's reference to "any act or threat . . . which is chargeable under State law," 18 U.S.C. § 1961(1)(A), "merely describes the type of generic conduct which will serve as a RICO predicate and satisfy RICO's pattern requirement." Id. at 1564. In other words, the phrase "chargeable under State law" does not require that the particular underlying conduct at issue could have been charged under state law, only that such conduct be chargeable as a general matter; i.e., that such conduct is criminal under state law. Id. at 1564-65. We based our decision in Coonan on our prior holding that "'Congress did not intend to incorporate the various states' procedural and evidentiary rules into the RICO statute.'" Id. at 1564 (quoting United States v. Paone, 782 F.2d 386, 393 (2d Cir. 1986)); see also id. ("'[State] rules governing double jeopardy and consecutive sentencing do not affect the generic definition of the crime . . . . Instead, they are essentially procedural rules governing prosecutions for all crimes in [the state].'") (quoting United States v. Friedman, 854 F.2d 535, 565 (2d Cir. 1988)).
 
 
 20
 Likewise, the government cites Orena, where we held that despite New York law's inclusion of "an overt act" on the part of one conspirator as an element of the crime of conspiracy, neither a RICO indictment relying on conspiracy to murder as a predicate racketeering act nor a VICAR indictment alleging conspiracy to murder needed to allege specifically that overt acts had been committed in furtherance of the conspiracy. See Orena, 32 F.3d at 713-14. There, we stated that "only a 'generic definition' of an underlying state crime is required in a RICO indictment, as distinguished from 'the elements of the penal codes of the various states where acts of racketeering occurred.'" Id. at 714 (quoting Bagaric, 706 F.2d at 62).
 
 
 21
 The Coonan and Orena authorities do not support the government's argument. Refusal to incorporate state procedural and evidentiary requirements has no logical bearing on the issue whether in a federal RICO prosecution the government must prove the elements of the state law offense that serves as a predicate racketeering act. Further, the proposition that the indictment need not recite all elements of the state law offense constituting a racketeering act does not, without further explanation, lead to the conclusion that the government is excused from proving those elements. The rule of Orena regarding what an indictment must contain is not unusual or in any way peculiar to RICO indictments. As a general matter, an indictment must be "framed to apprise the defendant[,] with reasonable certainty, of the nature of the accusation against him" and "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense . . . with which he is charged." Russell v. United States, 369 U.S. 749, 765 (1962) (internal quotation marks and citations omitted). These purposes and requirements of the indictment are irrelevant to whether the government must prove, and the jury must be charged on, the elements of the offense.
 
 
 22
 The government is correct, however, that Bagaric supports the government's position. We have doubts, however, whether Bagaric's principle can be applied as a practical matter in all circumstances. If the conduct proved at trial did not satisfy the elements of the offense as defined by state law, a jury could not find that the defendant had committed the state law offense charged as a predicate act of racketeering. Likewise, even assuming evidence from which a jury could find a violation of state law, if the defendant's acts as found by the jury did not include all the essential elements of the state law offense, by definition, no state offense would have been found. It is difficult to see (notwithstanding the statements in Diaz[1]) how the defendant could be properly convicted if the conduct found by the jury did not include all the elements of the state offense since RICO requires that the defendant have committed predicate acts "chargeable under state law." If a district judge failed to charge a jury on the state law elements of the crime constituting a racketeering act, neither we nor the district judge could know what were the factual determinations on which the jury based its verdict. Thus, we would be unable to determine what the jury decided the defendant actually did, and whether, under the jury's findings, the defendant committed the state law offense charged as a racketeering act.
 
 
 23
 We can imagine circumstances in which a failure to charge the jury on the elements of the state law crimes constituting predicate racketeering acts would be of small practical consequence. Consider, for instance, a defendant charged with robbery as a predicate act where the undisputed evidence shows the victim was robbed by a stranger at gunpoint and the only issue in question is whether defendant was the robber. There would be little or no danger that the jury might have found the defendant guilty based on a faulty understanding of what robbery consists of. But in other kinds of cases, confusion and unfairness can arise from failure to charge the elements of the state law crimes constituting racketeering acts.
 
 
 24
 We illustrate our concerns with variants of a hypothetical case. Assume a defendant charged with a RICO violation based on a predicate racketeering act of murder. (1) If the evidence showed only that the victim was killed by a gun held by the defendant, without any evidence that the defendant intended to harm or threaten the victim or to fire the gun, it seems clear enough that the defendant could not be properly found guilty of the murder. The evidence would be insufficient to show murder; we would think that a RICO conviction necessarily predicated on a finding of murder in such circumstances would have to be vacated. (2) It would be no different if the evidence included testimony to the effect that the defendant acted with intent to kill, but the jury rejected that evidence. Suppose, for example, the jury found the predicate act of murder but answered an interrogatory to the effect that the defendant fired the gun accidentally without intent to menace the victim. Once again, we doubt the conviction could stand because the defendant's actions, according to the jury's findings, would not constitute murder. (3) Assume as a third hypothetical: the evidence includes testimony that could support the requisite state of mind; the defendant contests it and asserts he acted in self-defense; the jury is instructed simply to find whether the defendant committed the offense of "murder," but is not instructed as to the requisite state of mind or the law respecting self-defense; the jury finds that the defendant committed the predicate act of murder and is guilty on the RICO charge. There would be no way for the reviewing court to know whether the jury had found facts constituting murder. Affirming such a conviction would be seriously problematic because the defendant's actions, as found by the jury, might not constitute murder. An appellate court would have no way of knowing what the jury found the defendant's state of mind to be.
 
 
 25
 No doubt for these reasons, in spite of Bagaric, district judges conventionally instruct juries on the elements of the state law offenses charged as predicate acts.[2] We think in most circumstances that is the best practice. It is true, the Bagaric holding establishes that, as a theoretical matter at least, a district judge may, within the judge's discretion, charge a predicate RICO offense by a generic description rather than giving the jury the elements in full. It does not follow, however, that such practice gives the jury sufficient instruction and the defendant adequate protection in all circumstances. Bagaric does not guarantee that such practice might not be found an abuse of discretion if, on the circumstances of the particular case, it risks prejudice to the defendant. Declining to instruct the jury on the elements of state law offenses charged as predicate acts under RICO, VICAR, and similar statutes, can prejudice the defendant. Notwithstanding Bagaric's theoretical approval, the practice risks reversal on appeal. The safer course is for trial judges to instruct the jury on the elements of the predicate offenses.
 
 
 26
 We have assumed in this discussion that state law elements of the crimes constituting predicate RICO and VICAR acts must be proved. We recognize that we stated in Diaz that in applying VICAR to a conspiracy to assault, that "the government [was] not required to prove an 'overt act' under Connecticut law." Diaz, 176 F.3d at 96. We have serious doubts, however, whether that assertion can stand the test of time. As an initial matter, this statement in Diaz was an extension of Bagaric. The Bagaric panel carefully noted that the case would have been different if the defendants had complained "that the racketeering act is not prohibited at all under state law." Bagaric, 706 F.2d at 63. Moreover, both the text of RICO and VICAR demand that predicate acts constitute state law crimes. RICO includes in its definition of prohibited racketeering activity only acts prohibited by enumerated federal statutes or "any act or threat involving murder, kidnapping, [etc.] . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1) (emphasis added).[3] Likewise, VICAR includes in its prohibition only enumerated acts that are "in violation of the laws of any State or the United States," or the "attempt[] or conspir[acy]" to so act (in violation of state or federal law).[4] 18 U.S.C. § 1959(a) (emphasis added).[5] Those statutes therefore seem to require of a predicate act based on state law that the act include the essential elements of the state crime. It is difficult to square the assertion in Diaz with the RICO and VICAR statutes.
 
 
 27
 For the reasons that follow, however, it is unnecessary for us to pursue the question further or to consider whether the court should convene in banc to deliberate on the continuing authority of Bagaric or Diaz.[6] In this case, the court's failure to charge the jury on the need to prove an overt act as an element of conspiracy to murder had no practical effect. As Ocasio's counsel conceded at argument, for each conspiracy-to-murder racketeering or VICAR act found by the jury, the jury also found that Ocasio committed the murder or attempted murder that was the objective of the particular conspiracy. Thus, the jury necessarily found that Ocasio himself had committed an "overt act" of murder or attempted murder in furtherance of each conspiracy to murder. For example, the jury found that Ocasio had committed the racketeering act of conspiracy to murder Rudolph Wyatt, and also found that he had committed the racketeering act of attempted murder of Rudolph Wyatt. Attempting a murder is clearly an "overt act" in furtherance of a conspiracy to commit that murder. Likewise, the jury found that Ocasio had committed the racketeering acts of conspiracy to murder Kelvin Lyons and Joseph Hendrickson, and also found that he had committed attempted murder of Kelvin Lyons and murder of Rufus Brown (mistaken for Hendrickson). The jury found that Ocasio had committed the racketeering acts of conspiracy to murder Robert and Axel Antonetti, and had committed the racketeering acts of the murders of Robert and Axel Antonetti. Because in each case, the jury necessarily found that overt acts had been committed in furtherance of the murder conspiracies, there can have been no prejudice to the defendant from the court's refusal to charge the jury on the need to find an overt act. Notwithstanding the trial court's failure to instruct the jury that an overt act is an essential element of the crime of conspiracy under New York law, the jury necessarily found an overt act committed in furtherance of each murder conspiracy. We therefore uphold Ocasio's conviction.
 
 CONCLUSION
 
 28
 We have considered Ocasio's other contentions and find them to be meritless. The judgment of the district court is hereby AFFIRMED.
 
 
 
 NOTES:
 
 
 [1]
 Diaz's statement that "the government [was] not required to prove an 'overt act,'" 176 F.3d at 96, goes far beyond Bagaric. Bagaric neither stated nor implied that the government did not need to prove all elements of state law crimes constituting RICO or VICAR predicate acts. To the contrary, in Bagaric, we were careful to distinguish the situation in which "the racketeering act is not prohibited at all under state law," 706 F.2d 62. The Bagaric holding therefore extended only to the principle that where the jury has found that all elements of an offense have been proved, a conviction cannot later be overturned on the formalistic grounds that the jury charge had omitted to state all elements. We further discuss this question below.
 
 
 [2]
 We note that although the Sand treatise on federal jury instructions does not address the issue of predicate acts with respect to RICO, the treatise does address the question with respect to the Travel Act. The Travel Act is a statute analogous to RICO in that it is an anti-racketeering statute that predicates federal criminal liability upon commission of state law crimes such as extortion and bribery. See 18 U.S.C. § 1952. The treatise clearly states that the elements of the predicate state law offense or offenses must be charged as elements of the federal crime of violating the Travel Act. See Leonard B. Sand et al., 3 Modern Federal Jury Instructions ¶ 60.01, at 60-29 (1999) (Instruction 60-10). Many courts have interpreted RICO by drawing analogies to interpretation of the Travel Act. See, e.g., United States v. Garner, 837 F.2d 1404, 1418 (7th Cir. 1987); United States v. Salinas, 564 F.2d 688, 690-91 (5th Cir. 1977); United States v. Forsythe, 560 F.2d 1127, 1137 (3d Cir. 1977). In fact, these courts have noted that in describing the role of state law, the legislative history of RICO intended to incorporate the holding of United States v. Nardello, 393 U.S. 286 (1969), regarding the role of state law in applying the Travel Act. See Nardello, 393 U.S. at 290 ("Congress intended that extortion should refer to those acts prohibited by state law which would be generically classified as extortionate); H.R. Rep. No. 91-1549 (1970), reprinted in 1970 U.S.C.C.A.N. 4007, 4032 ("State offenses are included by generic designation."). Judge Sand's proposed instructions for Travel Act prosecutions therefore provide particularly compelling evidence that instruction on the state law elements of predicate racketeering acts in RICO prosecutions is the preferred practice.
 
 
 [3]
 See 18 U.S.C. § 1961(1) ("'[R]acketeering activity' means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code . . . (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, or (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain.") (emphasis added).
 
 
 [4]
 Like New York's conspiracy statute, the federal conspiracy to murder statute requires an overt act by a member of the conspiracy in furtherance of the conspiracy. See 18 U.S.C. § 1117.
 
 
 [5]
 See 18 U.S.C. § 1959(a)
 ("Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . .") (emphasis added).
 
 
 [6]
 Prior to filing, this opinion was circulated to all the active judges of the court, and all have expressed agreement with it.