13-3979-cr(L)
United States v. Sanchez & Pagan

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of September, two thousand fifteen.

PRESENT: GUIDO CALABRESI,
REENA RAGGI,
RICHARD C. WESLEY,
*Circuit Judges*.

------------------------------------------------------------------------

UNITED STATES OF AMERICA,
*Appellee*,

v.

Nos. 13-3979-cr(L)
13-4859-cr(con)

CHRISTIAN SANCHEZ, AKA King Chi Chi, WILSON PAGAN, AKA King Gunz,
*Defendants-Appellants*,

PEDRO HERRERA, AKA King Aventura, ROGELIO RAMOS, AKA King Bogelio, FERNANDO MERLO, AKA King Dinero, ARMANDO SANCHEZ, AKA King Malo, AKA King Mondo, JASON CARABALLO, AKA King Loco, OSMAN NUNEZ, AKA King Ozzy, HUMBERTO MORALES, AKA King Papo, STEVEN LEWIS, AKA King Scoobz, CARLOS ROMERO, AKA King Los, WILFREDO SANCHEZ, AKA King Frito, FELIX LAGARES, AKA King Bavage, KELVIN LAGARES, AKA King Haze, JUAN RIOS, AKA King Juan, ANDREW SANCHEZ, AKA Animal, WILFREDO

1

NIEVES, AKA Jo Jo, NOEL VELEZ, LUIS TAMBITO, AKA King Luch, CHRISTOPHER MCNAIR, AKA King Speedy, WILLIAM OVERTON, AKA King TuTu, TOMAS JIMENEZ, AKA King Tunes, RICARDO RAMOS, AKA Carlito, NICHOLAS COLON, AKA King Tragedy, CARLOS ORTIZ, AKA King Tone, DAMON SINCLAIR, AKA King Dash, ANGELO DELEON, AKA King Truth, DEVON SMITH, AKA King Bullethead, EDNA REYES, AKA Queen Anita, RANDY ANGULO, AKA King Randy, LEO AUSTIN, AKA King Pumba, NELSON CALDERON, AKA King Murder, EVA CARDOZA, JOSE LAGOS, AKA King Gordo,

*Defendants.*

------------------------------------------------------------------------

APPEARING FOR APPELLANTS:     MARSHA R. TAUBENHAUS, Law Offices of Marsha R. Taubenhaus, New York, New York, *for* Christian Sanchez.

ROBERT JOSEPH BOYLE, ESQ., New York, New York, *for* Wilson Pagan.

APPEARING FOR APPELLEE:     BENJAMIN ALLEE (Brian A. Jacobs, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York.

Appeal from a judgment of the United States District Court for the Southern District of New York (Cathy Seibel, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgments entered on October 18, 2013, (as to Christian Sanchez) and December 20, 2013, (as to Wilson Pagan) are AFFIRMED.

Defendants Wilson Pagan and Christian Sanchez, two former heads of the Newburgh, New York, chapter of the "Latin Kings" gang, stand convicted after trial of 14 counts and 19 counts, respectively, relating to racketeering, violent acts in aid of

2

racketeering, firearms, and narcotics.[1] Pagan was sentenced principally to life plus 85 years' imprisonment, and Sanchez was sentenced principally to life plus 110 years' imprisonment. On appeal, both defendants challenge the sufficiency of the evidence supporting their convictions and ascribe myriad errors to the trial court. We assume the parties' familiarity with the facts and the record of prior proceedings, which we reference only as necessary to explain our decision to affirm.

1.    Pagan's Arguments

   A.    Juror Dismissal

Pagan faults the district court for dismissing a juror, after trial had begun, for professed financial hardship. We review a decision to discharge a juror before deliberation for abuse of discretion. See United States v. Fazio, 770 F.3d 160, 169 (2d Cir. 2014). We will not identify such abuse absent "bias or prejudice to the defendant," which may be found "when the discharge is without factual support, or for a legally irrelevant reason." Id. at 170. That is not this case.

The discharged juror, the sole employee of a small business, advised the court that her employer would not pay her during jury service unless she otherwise made up the time, circumstances that posed a financial hardship. See Trial Tr. 1419–20. The district court unsuccessfully tried to contact the employer and afforded the juror a day to seek employer consideration. When the juror was unable to do so, the district court had a sufficient

---

[1] Pagan was convicted of 15 counts, but the conviction on Count 31 of the Superseding Indictment, a violation of 18 U.S.C. § 924(c), was vacated without opposition by the government because it was a lesser included offense of the § 924(j) charge in Count 32.

factual basis to excuse the juror. See Trial Tr. 1422–23, 1679–80; cf. United States v. Millar, 79 F.3d 338, 342 (2d Cir. 1996) (identifying reasonable cause to dismiss juror where juror's "father died suddenly during the trial"). Under these circumstances, and in the absence of any other showing of prejudice, we identify no abuse of discretion warranting a new trial.

B. *Pinkerton* Jury Instruction

Pagan argues that the district court erroneously instructed the jury that it could find Pagan guilty of charged violent crimes in aid of racketeering, see 18 U.S.C. § 1959(a), on the basis of foreseeable acts of coconspirators in furtherance of their conspiracy. See Pinkerton v. United States, 328 U.S. 640, 646–48 (1946); accord United States v. Coplan, 703 F.3d 46, 71 (2d Cir. 2012). We review a preserved challenge to a jury instruction de novo, "viewing the charge as a whole," and we will reverse only if we identify both error and prejudice. United States v. Sabhnani, 599 F.3d 215, 237 (2d Cir. 2010). Where a challenge is unpreserved, we review only for plain error. See United States v. Nouri, 711 F.3d 129, 138 (2d Cir. 2013).

Pagan argues that the Pinkerton instruction was error because the violent crimes underlying the § 1959(a) charges were state offenses, and New York law rejects Pinkerton liability. See People v. McGee, 49 N.Y.2d 48, 56–58, 424 N.Y.S.2d 157, 161–62 (1979). Pagan's argument is foreclosed by United States v. Diaz, 176 F.3d 52 (2d Cir. 1999). There, we rejected a similar challenge to a Pinkerton instruction for a § 1959(a) charge based on a violent crime under Connecticut law. In so holding, Diaz stated that "the

4

racketeering statutes are not meant to incorporate state procedural and evidentiary law; rather, references to state law in these statutes serve merely a definitional purpose, that is, to identify generally the kind of conduct made illegal by the federal statute." Id. at 100. The pronouncement was not limited to § 1959(a) convictions predicated on violations of Connecticut law, although by that time Connecticut had expressly accepted the Pinkerton theory of liability. See State v. Walton, 227 Conn. 32, 45–46 (1993). Defendants argue that Diaz is therefore inapplicable where, as here, the state substantive criminal law governing the predicate acts expressly rejects Pinkerton liability. See People v. McGee, 49 N.Y.2d at 56–58, 424 N.Y.S.2d at 161–62 ("To permit mere guilt of conspiracy to establish the defendant's guilt of the substantive crime without any evidence of further action on the part of the defendant, would be to expand the basis of accomplice liability beyond the legislative design."). Defendants further argue that our circuit has since made explicit the need to prove at trial all elements of a state offense where the § 1959(a) conviction was premised on violations of state law. See, e.g., United States v. Desena, 287 F.3d 170, 177 & n.1 (2d Cir. 2002) (assuming for the purposes of the appeal that, where state law defined the predicate act under § 1959, the government needed to prove beyond a reasonable doubt the elements of state attempt liability, but explicitly finding it "unclear whether § 1959 imports state law of attempt and conspiracy or whether federal law governs" in such a context); see also United States v. Carrillo, 229 F.3d 177, 185–86 (2d Cir. 2000) (declining to decide the issue, but observing that the plain language of § 1961(1) and § 1959(a) "seem to require of a predicate act based on state law that the act

5

include the essential elements of the state crime").[2]

Defendants are correct that panels of this court have expressed some doubt about Diaz's continued viability. See United States v. Carrillo, 229 F.3d at 185 (expressing "serious doubts" about whether Diaz's reasoning on jury charges as to state substantive elements "can stand the test of time"); see also United States v. Pimentel, 346 F.3d 285, 302–05 (2d Cir. 2003) (repeating similar doubts). Nevertheless, this court has not expressly disavowed Diaz's broad language, much less reversed its holding. Even if these more recent precedents conflict with Diaz to some extent, Diaz remains controlling authority. See Tanasi v. New Alliance Bank, 786 F.3d 195, 200 n.6 (2d Cir. 2015) ("Where a second panel's decision seems to contradict the first, and there is no basis on which to distinguish the two cases, we have no choice but to follow the rule announced by the first panel."). Thus, in light of Diaz's explicit language, we cannot conclude that the district court's use of a Pinkerton instruction constituted plain error.

C.    Melendez's Statements

The district court admitted an out-of-court statement by Jason Melendez to Luis Tambito pursuant to Fed. R. Evid. 801(d)(2)(E). To admit a statement under that rule, the district court must make a preponderance finding "(a) that there was a conspiracy, (b) that its members included the declarant [here, Melendez] and the party against whom the statement is offered [here, Pagan], and (c) that the statement was made during the course of

---

[2] In that regard, we note that the jury charge in this case correctly instructed the jury as to all the elements of the underlying state crimes, but it then charged that the government could carry this burden on a Pinkerton theory.

6

and in furtherance of the conspiracy." United States v. James, 712 F.3d 79, 105 (2d Cir. 2013). The district court's findings on these issues are reviewed for clear error, see id., which is not evident here.

The record, which includes Melendez's statements, see Fed. R. Evid. 801(d)(2), supports the district court's finding that Pagan and Melendez were members of a conspiracy to assault or murder members of a rival gang, the Bloods. See United States v. Gigante, 166 F.3d 75, 83 (2d Cir. 1999) (holding that conspiracy must have "specific criminal goal in addition to a general conspiracy to be members of" gang). Relevant facts include: (1) Melendez's statement that he agreed with Pagan to shoot members of the Bloods, see Trial Tr. 2124; (2) a police officer's testimony that he encountered Melendez and Pagan on Dubois Street—the same street where Pagan's gang later attempted to murder a Bloods member—and found Melendez to be carrying a loaded firearm, see id. at 1713–16, 2124, 2400; and (3) a letter from Melendez stating his support for the Newburgh chapter of the Latin Kings, see Pagan App. 156. The record also supports the district court's finding that Melendez's statements to Tambito were in furtherance of the conspiracy. The statements informed Tambito of the rivalry between the Latin Kings and the Bloods, legitimized Melendez's authority within the Latin Kings, and justified Melendez's order to Tambito to fight Bloods members "on sight." Trial Tr. 2121–22; see United States v. Mandell, 752 F.3d 544, 552 (2d Cir. 2014) (holding that statements further conspiracy where they "prompt the listener to respond in a way that promotes or facilitates the carrying out of a criminal activity" or "serve to foster trust and cohesiveness, or inform

7

each other as to the progress or status of the conspiracy" (internal quotation marks and ellipsis omitted)).

Pagan's challenge to the admission of the Melendez statements therefore fails on the merits.

D.      Pagan's Sufficiency Challenges

On a sufficiency challenge, we view the record in the light most favorable to the government and will affirm if it would permit any rational jury to find guilt beyond a reasonable doubt.   See United States v. McGinn, 787 F.3d 116, 122 (2d Cir. 2015). Pagan submits that the record was insufficient to demonstrate that he (a) was responsible for the May 6, 2008 attempted murder of Anthony Hill, which resulted in the murder of Jeffrey Zachary, a finding necessary to Counts 1, 2, 3, 4, 5, 6, and 32; (b) conspired to violate the narcotics laws, a finding necessary to Counts 1, 2, 23, 29, and 30; and (c) conspired to commit assault on November 1, 2008, in aid of racketeering, a finding necessary to Counts 7 and 33.   We reject each of these challenges.

a.      May 6, 2008 Attempted Murder and Murder

The record shows that Pagan conspired with Melendez to shoot Bloods members in retaliation for the murder of Latin Kings member Brian Triminio and that Pagan, Jose Lagos (Triminio's brother), and Melendez, who was carrying a loaded firearm, were found on April 27, 2008, on the street where Hill, a Bloods member, lived.   See Trial Tr. 1712–16, 2400.   Evidence also showed that, ten days later, on May 6, 2008, when another Latin Kings member, Josh Torres, stated he was willing to kill a Bloods member, Lagos called

8

Pagan to the scene, and Pagan gave Torres the go-ahead.   See id. at 2110–13.   Finally, the evidence showed that after speaking to Pagan, Torres and Daniel Correa (a prospective member of the Latin Kings) attempted to shoot Hill, but instead shot and murdered Zachary.   See id. at 2117, 2466.

Viewed in the light most favorable to the government, this evidence supported a jury finding beyond a reasonable doubt that Pagan ordered the Hill murder and thereby caused the Zachary murder.

### b.   Narcotics Conspiracy

Pagan argues that the evidence showed only individual drug dealing and not any coordinated conspiracy.   This is belied by the record, which included recordings of Pagan dictating the drug-dealing practices of other Latin Kings members.   See Gov't Ex. 2802T, at 10–11 (instructing member to avoid drug conflict near property owned by his uncle); Gov't Ex. 2804T, at 8–9 (instructing members not to wear Latin Kings colors while dealing drugs or when encountering police); id. at 11 (warning members about federal investigation); id. at 17 (instructing members to avoid conflict on drug corners so as not to harm other Latin Kings' drug dealing business); id. at 18 (commenting that members were making sufficient money selling drugs).   Viewed in the light most favorable to the government, this evidence supported a jury finding of a common conspiracy.   See United States v. Berger, 224 F.3d 107, 115 (2d Cir. 2000) ("In the context of narcotics operations, . . . a single conspiracy exists where the groups share a common goal and depend upon and assist each other, and we can reasonably infer that each actor was aware of his part in a

larger organization where others performed similar roles." (internal quotation marks omitted)); accord United States v. Payne, 591 F.3d 46, 61 (2d Cir. 2010).

c.     Conspiracy To Assault in Aid of Racketeering

Pagan argues that the November 1, 2008 conspiracy to assault was not in aid of racketeering because there was no evidence that the intended victims were members of a rival gang. See Pagan Br. 52. That misses the point, which asks only whether the intended assault, whatever the association of its victims, was intended to aid defendants' racketeering. Trial evidence showed that a fight erupted between Latin Kings members and the assault victims after Latin Kings members displayed a gang sign. See Trial Tr. 2932. It further showed that one of the targeted individuals had a history of problems with the Latin Kings gang. See id. at 2484–85. These circumstances permitted the jury to find that Pagan entered the assault conspiracy because of his membership in the Latin Kings, and in order to further its objectives. See United States v. Farmer, 583 F.3d 131, 141 (2d Cir. 2009) (holding motive element of 18 U.S.C. § 1959(a) satisfied "if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership" (internal quotation marks omitted)).

Accordingly, all of Pagan's challenges to his conviction are meritless.

2.     Sanchez's Arguments

To the extent Sanchez joins several of Pagan's arguments, we reject them for the reasons just stated. Sanchez's individual arguments are also without merit.

10

A.    Alleged Fed. R. Evid. 605 Violation

Sanchez argues that the trial judge violated Fed. R. Evid. 605 by reading aloud from portions of several trial exhibits.   Although Sanchez did not object at trial, "[a] party need not object to preserve" an alleged Rule 605 error.   Fed. R. Evid. 605.   The complained-of action, however, raises no Rule 605 concern.

Rule 605 states that "[t]he presiding judge may not testify as a witness at the trial." The rule exists to prevent "situations where the judge presiding at the trial forsakes the bench for the witness stand or engages in equivalent conduct."   United States v. Sliker, 751 F.2d 477, 499 (2d Cir. 1984).   The district judge did not assume a witness role merely by reading from an exhibit already admitted into evidence because the witness reading the exhibit stumbled.   To the contrary, such conduct was permissible as part of the judge's duty to avoid wasting jury time.   See Fed. R. Evid. 611(a)(2).   The conclusion is only reinforced by the fact that there was no dispute here as to what the exhibit actually said and by the district judge's explicit instruction that the jury should disregard anything she may have said indicating a view of the evidence.   See Trial Tr. 3979.

Accordingly, Sanchez's Fed. R. Evid. 605 challenge fails.[3]

_____

[3] To the extent Sanchez contends that the prosecution engaged in misconduct by reading one of the admitted exhibits during summation, that argument is insufficiently briefed and therefore forfeited.   See United States v. Kerr, 752 F.3d 206, 218 (2d Cir. 2014).   In any event, the contention is meritless.   The government, like any party, may comment during summation on the contents of admitted exhibits.   See United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (noting that "Government has broad latitude in the inferences it may reasonably suggest to the jury during summation," as long as those inferences are reasonable "in light of the evidence presented at trial" (internal quotation marks omitted)).

11

B.      Recusal Claim

Sanchez argues that the district judge was required to recuse herself pursuant to 28 U.S.C. § 455(b)(3) because, before she became a judge, she had prosecuted members of a different chapter of the Latin Kings.   Section 455(b)(3) requires recusal if a judge "has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."   Where, as here, no recusal motion was made below, our review is limited to plain error.   See United States v. Carlton, 534 F.3d 97, 100 (2d Cir. 2008).   We identify no error, plain or otherwise.

Sanchez does not contend that the district judge played any prosecutorial role in his "particular case."   Section 455(b)(3) is therefore plainly inapposite.   The judge's prior involvement in a case involving a different chapter of the Latin Kings did not require recusal.   Judges in our circuit who previously prosecuted Mafia figures commonly hear cases involving the Mafia.   Compare, e.g., United States v. Coppola, 671 F.3d 220 (2d Cir. 2012) (reviewing Mafia-related trial overseen by Judge John Gleeson), with United States v. Locascio, 6 F.3d 924 (2d Cir. 1993) (reviewing Mafia-related trial prosecuted by then-Assistant United States Attorney John Gleeson).   This situation is no different and, thus, Sanchez's recusal challenge fails.

C.      Sanchez's Sufficiency Challenges

Sanchez challenges jury findings that he (a) joined the charged narcotics conspiracy, a finding necessary to Counts 23, 26, and 29; (b) conspired to murder a rival

12

gang member on March 9, 2010, a finding necessary to Count 16; (c) agreed that informant Samuel Cardona be assaulted, a finding necessary to Count 42; and (d) shot Mike Perez in furtherance of a racketeering enterprise, a finding necessary to Counts 22 and 40. Each challenge lacks merit.

### a. Narcotics Conspiracy

A cooperating witness testified that he, Sanchez, and other Latin Kings members "all decided to go sell crack and whatever we had" on a particular street in Newburgh and that Sanchez and another Latin Kings member made the decision to bring a gun. Trial Tr. 1276–77. Another witness testified that he saw Sanchez selling drugs at an intersection controlled by the Latin Kings. See Trial Tr. 1866–67. Viewed in the light most favorable to the government, these facts support Sanchez's conviction for narcotics conspiracy.

### b. Murder Conspiracy

Sanchez argues that the evidence showed only that he organized a mission to "shoot at" rival gang members, not that he intended the shooting to be fatal, i.e., that he intended to murder. The argument warrants little discussion because a reasonable jury could permissibly find that when Sanchez said, "shoot at," he meant kill.

### c. Assault of Cardona

Sanchez argues that although he agreed that Cardona be kicked out of the Latin Kings, he did not intend for Cardona to be assaulted. Sanchez concedes, however, that members who were kicked out of the gang were often assaulted. See Sanchez Br. 56.

13

Thus, when evidence is viewed in the light most favorable to the government, the jury could infer that when Sanchez agreed that Cardona be kicked out of the gang, he intended that it be effected, as occurred frequently, by an assault.

  d.  <u>Shooting of Perez</u>

Sanchez argues that the evidence was insufficient to show that he shot Perez with the purpose of "maintaining or increasing position" in the Latin Kings. 18 U.S.C. § 1959(a). Rather, Sanchez contends that the shooting resulted from an out-of-control "scuffle." Sanchez Br. 57. The trial testimony, however, indicated that the shooting was the culmination of a fight between Sanchez and Perez as part of an internal leadership struggle. <u>See</u> Trial Tr. 2083–90. From that testimony, a reasonable jury could infer that Sanchez shot Perez at least in part to protect his leadership position within the gang.

Accordingly, we reject all of Sanchez's challenges to his conviction.

We have considered defendants' remaining arguments and conclude that they are without merit. We therefore AFFIRM the judgments of the district court.

       FOR THE COURT:
       CATHERINE O'HAGAN WOLFE, Clerk of Court

14