# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2458/2728/3089/3133

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the Eastern |
| v. | * | District of Arkansas, Western |
| | * | Division |
| Daniel Harmon, Jr., and | * | |
| Roger C. Walls, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: June 18, 1999

Filed: October 15, 1999

_____

Before BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges, and KYLE, District Judge.[1]

KYLE, District Judge.

On July 11, 1997, a jury convicted Daniel Harmon, Jr., ("Harmon") of racketeering, three counts of conspiracy to extort property, and conspiracy to possess

_____

[1] The HONORABLE RICHARD H. KYLE, United States District Judge for the District of Minnesota, sitting by designation.

with intent to distribute marijuana. On January 13, 1998, a different jury[2] convicted Roger Walls ("Walls") of conspiracy to extort property. On appeal, Harmon and Walls challenge the sufficiency of the evidence used to convict them and the testimony of certain government witnesses. Harmon independently appeals the trial court's[3] denial of his motion for mistrial. Finally, Walls and the United States appeal certain sentencing decisions. We affirm.

## I. Background and Sufficiency of the Evidence

At all times relevant to the instant case, Harmon was the Prosecutor for the Seventh Judicial District of Arkansas. As prosecuting attorney, Harmon oversaw the Seventh Judicial District Drug Task Force, of which Walls was the director. The convictions challenged in this appeal relate to two separate sets of criminal activity: (1) several conspiracies in which Harmon and other individuals, including Walls, extorted money from individuals in violation of 18 U.S.C. § 1951(a) ("the Hobbs Act"); and (2) a conspiracy among Harmon and others to possess with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Based on these conspiracies, Harmon was also convicted of racketeering acts in violation of 18 U.S.C. § 1962.

---

[2] Harmon and Walls, along with several other defendants, were indicted together. Harmon's case was severed from the other defendants and tried to a separate jury because of Speedy Trial Act issues.

[3] The HONORABLE STEPHEN M. REASONER, United States District Judge for the Eastern District of Arkansas.

Harmon and Walls have challenged the sufficiency of the evidence on each of their convictions. "'In reviewing the sufficiency of the evidence to support a guilty verdict, we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict.'" United States v. Davis, 154 F.3d 772, 786 (8th Cir. 1998) (quoting United States v. Plenty Arrows, 946 F.2d 62, 64 (8th Cir. 1991)), cert. denied, 119 S. Ct. 1072, 1078, 1090 (1999). "We will reverse only if 'no reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" United States v. Escobar, 50 F.3d 1414, 1419 (8th Cir. 1995) (quoting United States v. Frayer, 9 F.3d 1367, 1371 (8th Cir. 1993)).

### A.	The Conspiracies to Extort Property

The government charged that Harmon, along with Walls and other individuals, conspired to extort money from individuals by promising not to prosecute them in exchange for payments of money. The jury found that Harmon engaged in a conspiracy to extort money from Freddie McCaslin ("McCaslin") and LaJean O'Brien ("O'Brien"), and a conspiracy to extort money from Patrick and Tina Davis. The jury also found that Harmon and Walls conspired to extort money from Ernest Varnado ("Varnado"). In order to prove the existence of a conspiracy, "the government must prove beyond a reasonable doubt that there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy." United States v. Ivey, 915 F.2d 380, 384 (8th Cir. 1990). The existence of an agreement may be proved by either direct or circumstantial evidence. See id. To establish an offense under the Hobbs Act, the government must prove beyond a reasonable doubt that: (1) the defendant induced

3

someone to part with property, (2) the defendant acted knowingly and willfully by means of extortion, and (3) the extortionate transaction delayed, interrupted, or adversely affected interstate commerce. See United States v. Stephens, 964 F.2d 424, 429 (5th Cir. 1992); 8th Cir. Model Criminal Jury Instructions 6.18.1951 (1996 ed.). Extortion is defined in 18 U.S.C. § 1951 as "the obtaining of personal property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, under color of official right." 18 U.S.C. § 1951(b)(2).

### 1. McCaslin/O'Brien Conspiracy

Count 4 alleged a conspiracy between Harmon and Bill Murphy ("Murphy"), an Arkansas criminal defense attorney, to extort money from McCaslin and O'Brien. McCaslin and O'Brien worked together selling drugs and used Murphy as their attorney when they or other members of their operation were arrested. On December 24, 1993, O'Brien was arrested in Benton, Arkansas. Murphy posted O'Brien's bail bond and told her that she would have to pay a substantial fine. The following Monday, O'Brien, Murphy, Harmon and Walls met in Harmon's office. O'Brien testified that Harmon told her that the case would cost $60,000, which included her fine of $40,000, McCaslin's fine of $10,000 from a previous case, and Murphy's attorney's fees in the amount of $10,000. Harmon asked her how long she needed to come up with the money, to which Murphy responded that it would take ten days.

O'Brien testified that the only way she could obtain the money was to sell drugs. After ten days she had made $16,000. O'Brien informed Murphy that she did not have all the money needed to pay her fine. Murphy told O'Brien to bring

4

whatever money she had and the title to her car and meet again with Murphy, Walls and Harmon in Harmon's office. At the meeting she paid $8000 to the three men and gave them the title to her car. She was allowed to keep the remaining $8000 in order to purchase a pawned diamond ring, which she traded in Los Angeles for two pounds of methamphetamine. O'Brien transported the methamphetamine back to Arkansas and sold it for approximately $70,000. She used this money to pay $60,000 to Murphy. O'Brien paid a total of $68,000 as a result of her December 24, 1993 arrest.

O'Brien also testified that at her plea and arraignment hearing, Murphy told her to stay downstairs because he did not want the judge to see her face. O'Brien stayed downstairs while Murphy entered a plea of not guilty. O'Brien had no further court appearances in connection with her December 24, 1993 arrest. O'Brien's case file indicates that the charges against her were dropped.

O'Brien was subsequently subpoenaed to appear in Hot Springs, Arkansas for a hearing related to Murphy. O'Brien testified that Harmon spoke to her outside of the courtroom and told her that when she got on the witness stand, her state case would be taken care of if she "did right" by Murphy. O'Brien responded that she thought that the money she had paid had taken care of the case. Harmon replied, "Well you just really need to do right by Murphy."

McCaslin also testified in Harmon's trial. McCaslin testified that he met with Murphy after O'Brien was arrested and that Murphy had told him that "Danny" (Harmon) wanted $30,000 for O'Brien's charge, $10,000 to prevent revocation of

5

McCaslin's probation, and $10,000 for Murphy's work in handling the deal. McCaslin testified that O'Brien made one payment to Harmon and they both made several payments to Murphy. Finally, FBI financial analyst John Messer testified that the records of the Seventh Judicial District Drug Task Force reflected payments by O'Brien and McCaslin in the amount of $25,000.

Upon careful review of the record, we are satisfied that the evidence, viewed in the light most favorable to the government, was sufficient to support the jury's verdict. The testimony of O'Brien and McCaslin provided evidence upon which a jury could find that Harmon entered into a conspiracy with Murphy to extort money from O'Brien and McCaslin. Specifically, O'Brien and McCaslin's testimony about their meetings with Harmon and Murphy, coupled with the fact that O'Brien was not prosecuted after her arrest, constitutes evidence from which a jury could find beyond a reasonable doubt that Harmon used his position as a prosecutor to obtain money in exchange for not prosecuting O'Brien. Furthermore, the discrepancy between the $68,000 payments testified to by O'Brien and the $25,000 credited to the Drug Task Force account provides additional evidence to support Harmon's conviction under count 4 of the indictment.

2.      Varnado Conspiracy

Count 7 alleged a conspiracy between Harmon and Walls to extort money from Earnest Varnado ("Varnado"). Varnado, a Texas resident, was arrested on Interstate 30 in Saline County, Arkansas on December 16, 1992, by officers of the Seventh Judicial District Drug Task Force for possession of a controlled substance. Before

6

being released on bond, Varnado had a conversation with Harmon about his case. Varnado testified that Harmon told him that he needed to pay Harmon some money and pledge the deeds to two houses as surety for the remainder of the money. One of the deeds was for a house owned by Joselyn McCain ("McCain"), Varnado's girlfriend. The total amount to be paid was $110,000.

Following Varnado's release from jail, Harmon, Varnado, and McCain had several phone conversations regarding arrangements for Varnado's payments. The first such payment occurred in Arkadelphia, Arkansas. McCain was present at the meeting and testified that Harmon told her that she could have the deeds back when the balance of the money Varnado owed was paid.

On May 5, 1993, Harmon and Walls drove to Fort Worth, Texas, to pick up Charles McConnel ("McConnel"), a prisoner awaiting extradition to Arkansas. Before picking up McConnel, Harmon and Walls went to Varnado's home to arrest him. Walls encountered Varnado in his bedroom and told Varnado that he was under arrest. Walls started to get his handcuffs when Harmon told Walls that he did not have to handcuff Varnado because Varnado was "too old to run." Walls then showed Varnado his gun, stating, "We've got the guns." No arrest warrant was served on Varnado. Prior to arresting Varnado, Harmon had received several calls from McCain in which she asked him to come to Fort Worth to get Varnado because Varnado was "messing with drugs." Harmon discussed these phone calls with Walls prior to May 5, 1993.

After arresting Varnado, Harmon and Walls picked up McConnel. The inter-

7

jurisdiction transfer of McConnel was accompanied by a Governor's warrant for extradition; no such documentation was included for Varnado's arrest or transfer.

Upon arriving in Arkansas, Harmon and Walls took McConnel to the Saline County Jail in Benton, Arkansas. McConnell was released on bond shortly thereafter. Walls then drove Harmon to his home and proceeded to take Varnado to the Grant County Jail. On the way to the Grant County Jail, Walls informed Varnado that he was not going to the Saline County Jail because the Saline County Jail was overcrowded.[4] Walls subsequently told Varnado that Harmon had stated that he "wasn't supposed to be" at the Saline County Jail.

Varnado remained at the Grant County Jail for thirty days, during which time he was not brought before a judge. After being released from the Grant County Jail, Varnado had a telephone conversation with Harmon in which Harmon asked when he was going to have more money. Varnado met with Harmon on two subsequent occasions, once in Ft. Worth and once in Benton, Arkansas. During the meeting in Benton, Arkansas, Varnado gave Harmon between $800 and $1,200. Varnado was subsequently arrested in Ft. Worth and, after a run of his driver's license showed an outstanding warrant, was extradited to Arkansas to face his original 1992 charge. Varnado received a ten-year suspended sentence, a $1,000 fine, and court costs.

---

[4] Judy Pridgen, Saline County Sheriff, testified during Walls's trial that the Saline County Jail had twenty-three available felony cells on May 5, 1993. This testimony was not presented during Harmon's trial and, accordingly, will be considered only as to Walls.

a.      Walls

Walls argues that there was insufficient evidence to support his conviction because the Government failed to prove that he knew the essential object of the conspiracy, extorting money from Varnado, or that he entered into an agreement with Harmon to that end. The government responds that Walls's conviction is supported by the evidence because: (1) Walls actively participated in taking Varnado from Ft. Worth, Texas and secluding him in the Grant County Jail; (2) Walls knew of Varnado's 1992 arrest; (3) Harmon told Walls on several occasions that McCain had called him and expressed her concerns about the property she had put up as collateral for Varnado's bond; (4) Walls did not have extradition papers for Varnado; (5) the fact that McConnell was released shortly after being extradited to Arkansas shows that the real reason for the trip was to pressure Varnado; (6) Walls took Varnado to the Grant County Jail, even though Varnado's pending charges were in Saline County, and offered differing reasons as to why he was taking Varnado to the Grant County Jail.

A conspiracy conviction requires a showing that the alleged individuals joined together to further an agreed-to criminal purpose: here, extortion of Varnado. See United States v. Cox, 942 F.2d 1282, 1285 (8th Cir. 1991). The Supreme Court has cautioned that "'charges of conspiracy are not to be made out by piling inference upon inference.'" Ingram v. United States, 360 U.S. 672, 680, 79 S. Ct. 1314, 1320 (1959) (quoting Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S. Ct. 1265, 1269 (1943)). Although the evidence against Walls is not as strong as that against Harmon, we are satisfied, after a review of the trial record, that there was sufficient

9

evidence for the jury to find beyond a reasonable doubt that Walls entered into an agreement with Harmon to extort money from Varnado. In particular, we conclude that the jury could permissibly infer Walls's knowledge of and involvement in the plan to extort money from Varnado from the evidence of the unusual circumstances surrounding Varnado's unauthorized "extradition" from Texas and his incarceration in the Grant County Jail.

### b.     Harmon

As to Harmon, we find that more than sufficient evidence exists to support his conviction for conspiring to extort money from Varnado. Harmon would have had the jury believe that the proposed payment of $110,000 was part of a proper bonding procedure and that his visits with Varnado and the manner in which Varnado was transported and incarcerated were innocent activities. We cannot conclude, however, that a reasonable juror must have entertained a reasonable doubt that Harmon conspired to extort money from Varnado. The jury had the opportunity to review Harmon's theory after hearing all of the evidence in the case and was in position to weigh that theory against the government's evidence. The jury obviously rejected his theory. Under the facts of this case, we see no reason to overturn the jury's decision.

### 3.     Davis Conspiracy

Count 9 alleged a conspiracy between Harmon and others to extort approximately $10,000 from Patrick Davis and his wife Tina Davis. On March 1, 1993, Patrick Davis ("Davis"), an Indiana resident, was arrested in Saline County,

Arkansas for possession of marijuana. After being placed in a jail cell in Benton, Arkansas, Davis called his wife, Tina, in Terre Haute, Indiana, and informed her that he had been arrested. Davis testified at Harmon's trial that he had a conversation with Harmon later that same day in which Harmon stated that he was under a $100,000 bond, and that he "needed $10,000 to get out." Harmon told Davis that if he paid the $10,000 he would be released and that the charge of possession of marijuana would "stay out of the computer system, that there would be nothing heard of it."

Tina Davis met with her husband the next day and he told her that they needed $10,000 to get him out of jail. Tina Davis raised the money by calling family and friends and then went to Harmon's office. Harmon told Tina Davis that her husband would not be released, stating first that he had made a weapon and tried to escape, and later that he had attempted suicide. Harmon then asked Tina Davis if she had any money. She responded that she had $10,000. Tina Davis testified that Harmon said he needed more money. When she indicated she could not come up with any more money, Harmon proposed that she spend the night with him at a hotel and work things out the next morning. Tina Davis declined the offer. Discussions continued and Harmon propositioned Tina Davis a second time, stating that, apart from paying money, the only way to get her husband out of jail was to spend the night with him. Tina Davis again declined the offer and Harmon eventually agreed to take the $10,000.

Harmon then arranged for Patrick Davis to be brought to his office. After Patrick Davis arrived, Tina Davis asked Harmon when they would have to come back

11

to court. Harmon responded, "Are you stupid or what." Harmon then had the Davises sign a document purporting to forfeit $10,000 as money taken from the Davises' persons upon Patrick Davis's arrest. The document, entitled "Disclaimer of Currency or Property," contained the following provision: "I hereby state that I am not the owner of this currency or property. I have no interest in it and have no claim for its return."

On April 5, 1993, a bench warrant was issued for Patrick Davis's arrest because he had failed to appear in connection with the possession of marijuana charge. Harmon recalled the warrant two days later.

Applying the previously cited elements for a conspiracy to extort property, we find that ample evidence exists to support Harmon's conviction as to Patrick and Tina Davis. In doing so, we reject Harmon's argument that insufficient evidence exists to convict him because $10,000 was the amount of Patrick Davis's bond and that amount was deposited into the Drug Task Force's account. The testimony of Patrick Davis and Tina Davis regarding the terms of their agreement with Harmon, and the ultimate resolution of Patrick Davis's possession of marijuana charge, supports the jury's conclusion that the $10,000 payment was not a bond payment, but rather a payment to Harmon that ended the case against Patrick Davis. Furthermore, the Disclaimer of Currency or Property form used by Harmon to secure the $10,000 misrepresents the genesis of those funds. The disclaimer provides that the $10,000 was seized from the persons of Patrick and Tina Davis at the time of Patrick Davis's arrest, when in reality, Tina Davis secured the money only after being telephoned by her husband and informed of his arrest. Thus, the jury could have found beyond a

12

reasonable doubt that Harmon falsified his claim to the $10,000 and that he was attempting to cover-up his efforts to extort money from the Davises in exchange for not prosecuting the possession of marijuana charge.

B.    **Drug Conspiracy**

Count 8 alleged that Harmon, together with John Steward ("Steward"), Arturo Valdez ("Valdez"), and Holly DuVall ("DuVall"), conspired to possess marijuana with intent to distribute. DuVall, who at that time was married to Harmon and working at his office, testified that Harmon told her to pick Valdez up from the airport and assist him in retrieving his car. Valdez had previously been arrested for transporting large packages of marijuana, which were hidden in the seats in his car. In early 1993, Harmon approached Steward, a long-time casual acquaintance, about the possibility of selling marijuana. Steward said he could sell marijuana and, a few weeks later, drove Valdez to the Little Rock airport at Harmon's direction. On August 4, 1993, Valdez telephoned Steward and arranged a location at which he could give Steward the marijuana. Steward met with Valdez, obtained the marijuana, and drove to DuVall and Harmon's house. Steward, DuVall, and Harmon brought the marijuana into the house and repackaged it into one pound bags. Steward took some of the marijuana and DuVall and Harmon kept the rest in a duffel bag in a closet in their home. After Steward left, DuVall asked Harmon what was going on, to which he responded that it was a chance to make some money. Steward had difficulty selling the marijuana so he contacted Harmon. Harmon told Steward about another individual who could assist and also had DuVall start selling the marijuana. Valdez eventually communicated that he wanted the money owed to him from the marijuana. Steward went to Harmon's house, retrieved $48,000 that DuVall and Harmon had

13

collected, and took it to Valdez's hotel. Valdez returned $5,000 to Steward to give to Harmon as payment on his fine from his earlier arrest.

Harmon argues that insufficient evidence exists to support his conviction for conspiring to possess with the intent to distribute marijuana because he was not a party to the conversations or meetings between Steward and Valdez, and because legitimate reasons existed for him to return Valdez's automobile. These claims do not refute, however, the testimony of both DuVall and Steward that Harmon solicited Steward to sell marijuana, assisted in the repackaging and sale of the marijuana, and oversaw the collection of funds to repay Valdez for the marijuana he fronted. Thus, sufficient evidence existed to allow the jury to conclude beyond a reasonable doubt that Harmon conspired to possess with the intent to distribute marijuana.

## C.    Racketeering Acts

Finally, Harmon challenges the sufficiency of the evidence on his conviction for racketeering acts. Count 1 of the indictment alleged that Harmon operated the Prosecuting Attorney's Office of the Seventh Judicial District of Arkansas, along with Roger Walls and Bill Murphy, in a pattern of racketeering activity. Harmon argues that insufficient evidence exists as to this count because insufficient evidence exists to support his convictions for counts 4, 7, 8, and 9 of his indictment, the predicate acts for his pattern of racketeering conviction. Because we have found that the jury's verdicts on those counts were supported by the evidence, we reject Harmon's challenge to his conviction for racketeering activity.

14

## II.    18 U.S.C. § 201

Harmon and Walls contend that the testimony of numerous government witnesses should have been excluded because they were promised leniency by the government in exchange for their testimony – a violation, they argue, of 18 U.S.C. § 201(c)(2), which criminalizes the exchange of "anything of value" for "testimony under oath or affirmation given or to be given . . . as a witness upon a trial."[5]  This court and nearly every other circuit to consider the improper compensation issue has held that a plea arrangement offered in exchange for testimony does not violate 18 U.S.C. § 201(c)(2).  See United States v. Johnson, 169 F.3d 1092, 1098 (8th Cir.1999), petition for cert. filed, No. 98-4870 (U.S. June 15, 1999).  Accordingly, Harmon and Walls's arguments are without merit.

## III.    Harmon's Motion for a Mistrial

Harmon also appeals the denial of his motion for mistrial made during the government's cross-examination of Paul Bosson ("Bosson").  Because we find that Harmon preserved his right to appeal this issue, we review the District Court's decision for abuse of discretion.  See United States v. Reeves, 83 F.3d 203, 207 (8th

[5] Harmon also claims that the district court's decision to allow the testimony of certain witnesses violated Arkansas Rule of Professional Conduct 3.4(b).  Harmon makes this claim, however, only in the captions of the sections of his briefs dealing with § 201(c)(2) and does not discuss Arkansas Rule of Conduct 3.4(b) anywhere in the text of his argument.  Accordingly, we will likewise limit our discussion to § 201(c)(2).

Cir. 1996) (citing <u>United States v. Quinn</u>, 543 F.2d 640, 650 (8th Cir. 1976)).

Bosson, a prosecuting attorney for the 18th Judicial District of Arkansas, was called by Harmon as a witness. On cross-examination, the government asked Bosson whether he had ever prosecuted Harmon. Bosson answered in the affirmative, but Harmon's counsel objected before Bosson could give the reasons for the prior prosecution. The district court then heard testimony from Bosson without the jury present. Bosson stated he was involved in prosecuting Harmon for kidnaping, terroristic threatening and assault against DuVall, and assaults involving a newspaper reporter, two Saline County deputies, and a store clerk in Hot Springs, Arkansas. Bosson also stated that DuVall denied that Harmon kidnaped her or meant to terrorize her. At the conclusion of the closed hearing, Harmon asked for a mistrial based upon the question posed to Bosson, which the district court took under advisement. The district court subsequently denied the motion for mistrial, but offered to give a cautionary instruction. Harmon did not ask for a cautionary instruction at that time.

Later, the government asked Harmon on cross-examination whether he had previously been charged with kidnaping and assault. Harmon again moved for a mistrial. Harmon subsequently requested a cautionary instruction that covered both the testimony elicited from Bosson and the question asked of Harmon, and withdrew his second motion for a mistrial.

Before giving the jury its final instructions, the district court gave the following cautionary instruction:

At some point . . . some mention was made about a kidnaping charge.

16

Actually, Mr. Harmon was charged in Saline County Circuit Court on three counts, one for aggravated assault, one for terroristic threatening, and one for assault involving an incident involving Ms. DuVall on March 29, 1996. Later, as a result of a negotiated plea regarding the other counts, that matter was dropped.

Mr. Harmon, I believe, plead guilty to two misdemeanor counts involving something else not involved with that and agreed to resign his office . . . I wanted to clear that up since it was mentioned about a kidnaping charge. Actually, he was not charged with that. But in any event, that's something that shouldn't enter into your consideration with the facts of the case because I told you at the very beginning, Mr. Harmon is only on trial here for what's charged in the indictment nothing else.

Upon Harmon's request, the district court added: "During testimony outside your presence . . . Mr. Bosson, who you heard testify and was appointed special prosecutor in that case stated: 'Holly Harmon, once we got her in the office and began questioning her, she denied that Dan had kidnaped her, she denied that he had meant to terrorize her and so the case – her case started going down the drain real quick. We had other charges, and then Mr. Harmon was involved.'" Harmon requested no further cautionary instructions.

The government argues that Harmon failed to preserve his right to appeal the denial of his first motion for mistrial and that, as a result, the issue is not properly before us. We disagree. Our review of the record assures us that Harmon withdrew his second motion for a mistrial, but not his first motion. Furthermore, the fact that the cautionary instructions given by the Court covered both incidents does not mean that Harmon waived his right to appeal the district court's denial of his first motion for a mistrial. As the record makes clear, Harmon made the motion for a mistrial during Bosson's cross-examination, the district court denied the motion and offered

17

to give a cautionary instruction, and Harmon subsequently agreed to a cautionary instruction that related to both Bosson's testimony and the question asked by the government during his own cross-examination. We find nothing in this chain of events indicating that Harmon waived his right to raise the instant issue on appeal.

We find, however, that any harm created by Bosson's statement that he had prosecuted Harmon was cured by the district court's cautionary instruction. We have previously observed that "measures less drastic than declaring a mistrial, for instance giving the jury a curative instruction, ordinarily alleviate any prejudice flowing from improper testimony." United States v. Flores, 73 F.3d 826, 831 (8th Cir. 1996); see also United States v. Nelson, 984 F.2d 894, 897 (8th Cir. 1993) ("The admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the testimony.") In the instant case, the district court gave, in essence, two cautionary instructions, both of which were made at Harmon's request. These instructions clarified the charges filed against Harmon by Bosson and their subsequent resolution, and instructed the jury members that the prior charges shouldn't enter into their consideration of the case because Harmon was only on trial for what was charged in the indictment. We conclude that these cautionary instructions cured any possible prejudice resulting from Bosson's testimony and, thus, the district court did not abuse its discretion in denying Harmon's first motion for a mistrial.

## IV.    Sentencing Issues

Walls and the government challenge the district court's sentencing calculations

18

on separate grounds. Walls contends that the court erred by denying him a two-level downward departure under U.S.S.G. § 3B1.2(b) for his status as a "minor participant" in the conspiracy to extort Varnado. We review the district court's finding that Walls was not a minor participant for clear error. See United States v. Chatman, 119 F.3d 1335, 1341 (8th Cir.), cert. denied, 118 S. Ct. 434 (1997). We have previously stated that under § 3B1.2(b),

> [w]hether a downward departure is warranted is determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, but also by measuring each participant's individual acts and relative culpability against the elements of the offense.

United States v. Snoddy, 139 F.3d 1224, 1228 (8th Cir. 1998) (citing United States v. Goebel, 898 F.2d 675, 677 (8th Cir. 1990)). Our review of the record reveals no error in the district court's assessment of Walls's role in the offense.

The government appeals the district court's sentencing calculations as to both Harmon and Walls, arguing that the court chose the wrong base offense level. The district court applied U.S.S.G. § 2C1.1, "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion under Color of Official Right," instead of § 2B3.2, "Extortion by Force or Threat of Injury or Serious Damage." The applicability of a section of the Sentencing Guidelines is a question of law which we review de novo. See United States v. Triplett, 104 F.3d 1074, 1081 (8th Cir.), cert. denied, 520 U.S. 1236, 117 S. Ct. 1837 (1997).

The Background to § 2C1.1 provides that the section "applies to a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to

participate in a fraud or to influence his official actions, or to a public official who solicits or accepts such a bribe." As examples, the Background to § 2C1.1 indicates that § 2C1.1 covers Hobbs Act extortion ranging from a city building inspector who demands a small amount of money from the owner of an apartment building to ignore code violations to a state court judge who extracts substantial interest-free loans from attorneys who have cases pending in his court. If, however, the offense involved a "threat of physical injury or property destruction," and the resulting offense level is greater than that under § 2 C1.1., the district court must apply § 2B3.2. See U.S.S.G. § 2C1.1(c)(3). Application Note 2 to § 2B3.2 states, in relevant part, that § 2B.3.2 applies "if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business."

In the instant case, Harmon and Walls extorted money from individuals by soliciting monetary payments in exchange for not prosecuting them for crimes for which they otherwise would have been prosecuted. This conduct did not involve threats of physical injury or property destruction, only the threat of prosecution. We find that the extortion engaged in by Harmon and Walls falls squarely within the spectrum of conduct encompassed within § 2C1.1, extortion by color of right, particularly as illustrated by the examples in the Background to that section. In so concluding, we reject the government's argument that Harmon and Walls did threaten substantial economic harm, or make a comparably serious threat to Varnado. The operative "threat" to all of the extortion victims, including Varnado, was that they would be prosecuted for their pending criminal charges. Thus, we conclude that the district court properly applied § 2C1.1 when sentencing Harmon and Walls.

**V.      Conclusion**

For the reasons stated above, we affirm the judgment of the district court.


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.