# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2897

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Chevie O'Brien Kehoe, also known | * | |
| as Jonathan Collins, also known as | * | |
| Chevie Collins, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 28, 2002

Filed: November 8, 2002

_____

Before WOLLMAN, MORRIS SHEPPARD ARNOLD, and MELLOY, Circuit
  Judges.

_____

WOLLMAN, Circuit Judge.

Chevie Kehoe and Daniel Lee were charged with conspiring to violate and
violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18
U.S.C. §§ 1962(c) and (d), with murdering William and Nancy Mueller and Sarah
Powell in aid of racketeering in violation of 18 U.S.C. § 1959, with a robbery
conspiracy in violation of 18 U.S.C. § 1951(a), and with other substantive offenses.

Kehoe and Lee were tried jointly in the district court[1] and were convicted of the substantive RICO offense, RICO conspiracy, various predicate acts under the RICO offense, and three capital counts of murder in aid of racketeering. Separate penalty proceedings were held because the death penalty was at issue. 18 U.S.C. § 3593(a). Kehoe was sentenced to life imprisonment without possibility of release.

On appeal, Kehoe raises a number of issues, including that the evidence presented was insufficient to establish an enterprise for purposes of RICO, and that his rights under the Fifth, Sixth, and Tenth Amendments of the United States Constitution were violated. For the reasons stated below, we affirm his conviction.

## I. FACTS

"We state the facts in the light most favorable to the jury's verdict." United States v. Gundersen, 195 F.3d 1035, 1037 (8th Cir. 1999); United States v. Kragness, 830 F.2d 842, 847 (8th Cir. 1987). Chevie Kehoe, his father, Kirby Kehoe, his brother Cheyne Kehoe, co-defendant Daniel Lee, and Faron Lovelace were involved in a variety of criminal activities to promote and fund a white supremacist organization founded by Kehoe, known as the Aryan Peoples' Republic and the Aryan Peoples' Resistance (APR). APR, the RICO enterprise charged in the indictment, emulates an anti-governmental, white supremacist organization called the Order, formed by the late Robert Mathews.[2] Kehoe envisioned that APR would succeed where the Order had failed. APR would establish an independent country in the Pacific Northwest composed only of white members of the Christian Identity

---

[1]The Honorable Garnett Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

[2]The Order is described in the book The Silent Brotherhood: Inside America's Racist Underground, by Kevin Flynn and Gary Gerhardt.

faith. The population would be maintained through the practice of polygamy and by the recruitment of people with similar beliefs, such as that Jewish people are the devil's lineal descendants and that white members of Christian Identity are the chosen.

In February 1995, Kehoe and his father robbed the Arkansas home of William Mueller, a formerly licensed gun dealer who owned a large collection of weapons and ammunition. Kehoe and his family transported the stolen property, which included guns, gun-parts, ammunition, and gun-related merchandise, from Mueller's home in Tilley, Arkansas, to the Shadows Motel in Spokane, Washington, by way of the Christian Identity community in Elohim City, Oklahoma, where Kehoe met Lovelace.

In June 1995, Kehoe and Lovelace kidnapped and robbed Malcolm and Jill Friedman, a Jewish couple, who owned a store in Coleville, Washington, at which Kehoe once was employed. Kehoe and Lovelace robbed the Friedmans of more than $15,000. Kehoe retained the majority of the money and distributed the remainder to Lovelace and Kirby Kehoe. Both Kehoe and Lovelace bought real property near Priest River, Idaho, with their respective portions of the proceeds from the kidnapping and robbery.

In January 1996, Kehoe and Lee returned to Mueller's property. Posing as federal agents, the two men overpowered William Mueller, his wife Nancy, and her eight-year-old daughter Sarah Powell. After incapacitating William and Nancy, Kehoe and Lee questioned Sarah Powell regarding the location of the approximately $50,000 Mueller had in his possession. After taking Mueller's money, as well as coins and firearms, Kehoe and Lee placed plastic bags over victims' heads and affixed the bags to their bodies with duct tape. After weighting the bodies with rocks and binding them further with duct tape, Kehoe and Lee threw them into the Illinois

Bayou. The corpses were discovered in Lake Dardanelle near Russellville, Arkansas, in late June 1996.

Kehoe and Lee returned to Spokane, Washington, around January 14, 1996, with property stolen from the Muellers. Over the next few months, Kehoe moved about the country frequently. Kehoe traveled to his parents' residence in Yaak, Montana. He and Cheyne then traveled to Arizona, and then to Texas. In all of these states, Kehoe, as well as other members of his family, sold Mueller's guns and property. While in Texas, Kehoe confessed his role in the Mueller murders to Cheyne, telling him that he and Lee wore federal officer raid jackets and caps when they ambushed the Muellers and Powell. He then described the manner in which he and Lee killed the family and disposed of their bodies.

On February 15, 1997, after attending a gun show in Cincinnati, Ohio, Kehoe and Cheyne were stopped by police officers in Wilmington, Ohio. The officer asked Kehoe, who was driving, to provide identification. After Kehoe refused to do so, the officer asked him to step out of the Chevrolet Suburban, at which point Kehoe ran from the officer. Cheyne pulled out a gun and began to fire. Kehoe ultimately drove away in the confusion, leaving Cheyne to flee on foot. Kehoe drove to an industrial park. Shortly thereafter, another team of police officers found the Suburban. As an officer approached the Suburban, Kehoe fired approximately thirty-three rounds at him and his colleague. Although neither officer was injured seriously, a passer-by was shot in the arm. Kehoe escaped on foot. A search of the Suburban revealed property belonging to the Muellers, along with the federal raid jackets and caps used during the robbery and murders.

Both Kehoe and Cheyne stole cars and drove west. Kirby met Cheyne in Wyoming, and Kehoe met his mother, Gloria Kehoe, in South Dakota. The family reunited in Utah. In June 1997, Cheyne turned himself in to police. He provided the police with paint samples from the Suburban, which matched paint stuck to the duct

-4-

tape used to bind the Muellers and Powell. Shortly thereafter, Kirby was arrested on gun violations, but was released pending trial. Gloria contacted ATF agents in Spokane, stating that she had begun to fear for her life because "she knew too much." She provided information that led to the discovery of more of the Muellers' property in storage units rented to the Kehoes, including numerous weapons and a key fitting the handcuffs that Mueller was wearing at the time of his death. Gloria also told the officers that both Kehoe and Lee had confessed to their roles in the Mueller murders.

Kehoe, Lee, and Kirby Kehoe were among the APR members indicted on December 12, 1997. Kirby pled guilty to conspiring to violate RICO and cooperated with authorities. Following a two-month trial, a jury convicted Kehoe and Lee on all five counts of the indictment.

## II. RICO

We first address Kehoe's arguments concerning his RICO convictions. RICO makes it a crime "for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Conspiracy to engage in activity constituting a substantive RICO offense under § 1962(c) is a separate criminal offense under § 1962(d). To obtain a conviction under RICO, the government or plaintiff must prove both the existence of an enterprise, as well as a pattern of racketeering activity. United States v. Turkette, 452 U.S. 576, 583 (1981). An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); Turkette, 452 U.S. at 583. "Racketeering activity," for purposes of RICO, includes "any act or threat involving murder, kidnapping, . . . robbery, bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year . . . ." 18 U.S.C. § 1961(1).

Kehoe contends that his convictions under RICO should be overturned because the evidence presented was insufficient to prove the existence of an "enterprise" for the purposes of RICO. Kehoe also argues that his prosecution for both the substantive RICO offense and the RICO conspiracy is barred by the Double Jeopardy Clause of the Fifth Amendment.

## A. Sufficiency of the Evidence to Show an Enterprise

Kehoe contends that there was insufficient evidence to prove the existence of an enterprise under RICO, and, thus, that there was insufficient evidence to show that he conspired to commit a substantive RICO offense and committed murder to further the enterprise. Kehoe asserts that the evidence shows only that he contemplated organizing a group in the future.

When the sufficiency of the evidence to support a guilty verdict is challenged, we review "the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." United States v. Harmon, 194 F.3d 890, 892 (8th Cir. 1999) (citation omitted). We will reverse the jury's verdict "only if 'no reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" Id. (quoting United States v. Frayer, 9 F.3d 1367, 1371 (8th Cir. 1993)).

Under RICO, an "enterprise is established 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" United States v. Kragness, 830 F.2d 842, 855 (8th Cir. 1987) (quoting Turkette, 452 U.S. at 583 (1981)). Three characteristics distinguish a RICO enterprise from "individuals who associate [to commit] sporadic crime." Id. The individuals involved in a RICO enterprise share a common purpose or goal. Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 769 (8th Cir. 1992). There is a

continuity of personnel, and the organization which they advance is ongoing.  Id.
Finally, "an ascertainable structure [exists, which is] distinct from that inherent in the
pattern of racketeering."  Id. at 769-70; see also Turkette, 452 U.S. at 583; Kragness,
830 F.2d at 855; United States v. Bledsoe, 674 F.2d 647, 665 (8th Cir. 1982) (internal
quotations and citations omitted).

The evidence presented was sufficient for a reasonable jury to conclude that
each of these elements was met.  First, the Kehoes, Lee, Lovelace, and others shared
the common purpose of advancing the interests of the APR, with the eventual goal
of forming a country for members of Christian Identity.  Gloria Kehoe testified that
Kehoe and other members of APR targeted robbery victims, including the Friedmans,
based on their race or ethnicity.  Kehoe and Lovelace used the proceeds from the
Friedman robbery to buy property in Priest River, Idaho, where, ultimately, the group
would congregate or live.  Kehoe and Lee exchanged letters after their arrest signed
with symbols associated with the APR.  Lee bore a tattoo with the APR's symbol.

Second, the Kehoes, Lee, Lovelace and others worked in concert to advance
the APR's goals.  Evidence showed that the members of the organization were
stockpiling munitions, including armor-piercing bullets and a fire hydrant intended
to disguise a bomb.  Although the same combination of individuals did not participate
in each and every criminal activity undertaken by the group, all members participated
in criminal activities with the intent to advance the APR's goals.  The members were
consistent companions and recurrent cohorts.  Evidence was presented that a member
of the group, Jon Cox, was killed because he revealed information about the plans for
future robberies.  Although the jury did not convict Kehoe on this charge, the
evidence likely contributed to the jury's finding that an enterprise existed.

Finally, the APR's structure differs from that inherent in each act engaged in
by members of the group.  Evidence presented attested to a hierarchy within the APR.
Kehoe founded and led the APR.  He possessed and controlled the majority of the

proceeds from the enterprise's illegal activities. He distributed the remainder to his cohorts.

Kehoe argues that even if an enterprise existed, there was insufficient evidence to show that the Muellers were murdered to further that enterprise. We disagree. The Muellers were targeted because Kehoe believed that they possessed a significant sum of money and ammunition. It was also rumored that Mueller was an FBI informant. The Muellers and Sarah Powell were not killed until Kehoe and Lee had gained possession of Mueller's cash and coin assets. In addition, Kehoe and Lee took numerous weapons and a large amount of ammunition from the Mueller house and either stockpiled or sold them. The proceeds of the sales furthered APR's activities.

This evidence is sufficient for a reasonable jury to have concluded that a RICO enterprise existed, in furtherance of which Kehoe committed the crimes charged. Accordingly, we reject each of Kehoe's arguments that the evidence was insufficient to support the jury verdict.

## B. Double Jeopardy

Kehoe asserts that his indictment under both 18 U.S.C. § 1962(c), the substantive RICO offense, and § 1962(d), conspiring to engage in a RICO substantive offense, violates the Double Jeopardy Clause of the Fifth Amendment because the offenses are the same in law and fact. We disagree.

The Double Jeopardy Clause protects a defendant from "both successive prosecutions and multiple punishments for the same criminal offense." United States v. Bennett, 44 F.3d 1364, 1368 (8th Cir. 1995) (citing North Carolina v. Pearce, 395 U.S. 711, 717 (1969)). To show a violation of the Double Jeopardy Clause, a defendant must prove that the offenses for which he is prosecuted and punished are the same offense in both law and fact. Id. (citation omitted). Offenses are not

considered the "same," if "each of the offenses . . . requires proof of a different element." Blockburger v. United States, 284 U.S. 299, 304 (1931); United States v. Dixon, 509 U.S. 688, 696-97 (1993). Section 1962(c) creates a substantive RICO offense, while § 1962(d) renders it unlawful "for any person to conspire to violate any of the provisions of subsection . . . (c) . . . ." 18 U.S.C. §§ 1962(c), (d) (emphasis added). Furthermore, to show a RICO conspiracy in violation of § 1962(d), the plaintiff must present evidence beyond that required to establish a right to relief under § 1962(c). Handeen v. Lemaire, 112 F.3d 1339, 1354-55 (8th Cir. 1997) ("When a plaintiff has already established a right to relief under § 1962(c), he may show a conspiracy to violate RICO simply by presenting additional evidence that the defendant entered into an agreement to breach the statute."). The additional evidence required to show a RICO conspiracy "need only establish a tacit understanding between the parties, and . . . may be shown wholly through the circumstantial evidence of [each defendant's] actions." Id. at 1355 (citation omitted).

The offenses prescribed by 18 U.S.C. §§ 1962(c) and (d), "[a] substantive crime and a conspiracy to commit that crime are not the 'same offense' for double jeopardy purposes." United States v. Felix, 503 U.S. 378, 389 (1992); United States v. Miller, 995 F.2d 865, 868 (8th Cir. 1993); Bennett, 44 F.3d at 1375 ("[A] RICO substantive charge is not a conspiracy and it is axiomatic that a substantive offense is distinct from a conspiracy to commit that or another substantive offense."). Accordingly, we reject Kehoe's Double Jeopardy claim.

### III. TENTH AMENDMENT

Kehoe argues that his conviction in federal court under 18 U.S.C. § 1959, for three murders committed in Arkansas, violates the Tenth Amendment. Kehoe asserts that his conviction for the murders rests solely on Arkansas substantive law, and that by prosecuting him for state law offenses in federal court, the government improperly encroached upon state sovereignty. This argument is without merit.

-9-

Kehoe was convicted of murder in aid of racketeering in violation of 18 U.S.C. § 1959, which states, "Whoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps . . . or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . ." 18 U.S.C. § 1959(a). RICO explicitly provides that conduct that violates a state or federal criminal law is a requisite element of a § 1959 violation. Such crimes of violence constitute predicate acts under RICO. United States v. Martino, 648 F.2d 367, 381 (5th Cir. June 1981). RICO criminalizes "the furthering of the enterprise, not the predicate acts." Id. Thus, "RICO was enacted to supplement rather than replace the existing predicate crimes and penalties." Unites States v. Crosby, 20 F.3d 480, 484 (D.C. Cir. 1994) (holding indictment under 18 U.S.C. §§ 1962(c) and (d) was not barred by the Double Jeopardy Clause of the Fifth Amendment, where defendants had been prosecuted previously for the criminal activity constituting predicate acts in those counts).

"RICO's allusion to state crimes was not intended to incorporate elements of state crimes" into the RICO statute. United States v. Carrillo, 229 F.3d 177, 182 (2d Cir. 2000). Rather, RICO's reference to state crimes identifies "the type of generic conduct which will serve as a RICO predicate and satisfy RICO's pattern requirement." Id. (quoting United States v. Coonan, 938 F.2d 1553, 1564 (2d Cir. 1991)). Because a RICO violation is a "discrete offense that can be prosecuted separately from its underlying predicate offenses," Crosby, 20 F.3d at 484, it necessarily follows that RICO does not bar a state from prosecuting an individual for the state law crimes, which may serve as predicate acts for the RICO offenses, Carrillo, 229 F.3d at 182 ("[A] prior acquittal [under New York state law] did not bar the RICO prosecution . . . ."). Furthermore, "Congress did not intend to incorporate the various states's procedural and evidentiary rules into the RICO statute." Id. at 183. The provisions of RICO and § 1959 do not improperly encroach upon state

sovereignty to prosecute individuals for state common law crimes, and, thus, do not violate the Tenth Amendment. See Martino, 648 F.3d at 381 (rejecting proposition that RICO violates the Ninth and Tenth Amendments).

## IV. PROCEDURAL ERRORS

### A. Inconsistent Jury Verdicts

Kehoe argues that his conviction should be invalidated because of apparent inconsistencies between the jury's verdict in the guilt phase and specific findings made in the penalty phase. The jury convicted Kehoe on the RICO offenses and found him guilty of the predicate offenses of three capital murders. In the sentencing phase, however, the jury indicated that Kehoe did not possess two of the three mental states required to receive the death penalty. In other words, in the sentencing phase, the jury did not find unanimously that Kehoe intentionally killed the Muellers and "intentionally participated in an act, contemplating that the life of [the victim] would be taken . . . ." The jury found unanimously that Kehoe possessed the third requisite mental state: "Kehoe intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to [the victim], and that participation in the act constituted a reckless disregard for human life and [the victim] died as a result of the act." Kehoe argues that because the jury instruction on murder requires that the government prove that he "purposefully" committed an act of homicide,[3] and because in the sentencing phase the jury did not find that he did so

_____

[3]Jury Instruction No. 19 states, in relevant part:

Section 5-10-102(a)(2) of the Arkansas Code of 1987, provides:

> A person commits murder in the first degree if, with a purpose of causing the death of another person, he causes

-11-

intentionally, the jury committed error during the guilt phase and his conviction thus must be overturned.

Whatever inconsistency may exist in the jury's findings, we conclude that it offers Kehoe no ground for relief, for "[i]t is well established that consistency of a jury's verdicts is not necessary." United States v. Finch, 16 F.3d 228, 230 (8th Cir. 1994) (citing Dunn v. United States, 284 U.S. 390, 393 (1932)). Moreover, the inconsistency, if any, was between the verdict returned in the guilt phase and the special findings entered in the sentencing phase. Findings in the sentencing phase of a capital case are intended to be narrow. See Lowenfield v. Phelps, 484 U.S. 231, 241 (1988). One of the sentencing findings was consistent with the guilty verdict, while two allegedly were not. Any inconsistency is inconclusive: "[I]t may have been the result of compromise, or of a mistake on the part of the jury . . . . But verdicts cannot be upset by speculation or inquiry into such matters." Finch, 16 F.3d at 230-31 (citing Dunn, 284 U.S. at 394).

As we noted in Finch, Kehoe "is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence." Id. at 231

---

the death of another person.

To sustain this charge, the government must prove beyond a reasonable doubt:

(1) that the named defendant or an accomplice did, with a purpose of causing the death of the victim, cause the death of the victim; and

(2) that the act occurred in the State of Arkansas.

"Purpose" – A person acts with purpose with respect to his conduct, or a result thereof, when it is his conscious object to engage in the conduct of that nature or to cause such a result.

-12-

(citing United States v. Powell, 469 U.S. 57, 67 (1984)).  Based on our review, we find that the evidence supports a finding of Kehoe's guilt in the murders of William Mueller, Nancy Mueller, and Sarah Powell.

We affirm the district court's denial of Kehoe's motion to overturn his conviction.

## B. Disqualification of Counsel

Kehoe argues that the district court abused its discretion in refusing to disqualify the United States Attorney's Office from prosecuting Kehoe.  Karen Coleman, an attorney who worked for Lee's appointed counsel during pre-trial proceedings, was hired by the United States Attorney's Office early in this case. Kehoe does not allege that Coleman revealed client confidences after assuming employment with the United States Attorney's Office. Furthermore, Kehoe concedes that Coleman was walled off from this case.  Such action is sufficient to prevent disqualification on ground of conflict of interest.  See Blair v. Armontrout, 916 F.2d 1310, 1333 (8th Cir. 1990).  Because there has been no showing of an abuse of discretion, we affirm the district court's denial of Kehoe's motion to disqualify the United States Attorney's Office.  Fred Weber, Inc. v. Shell Oil Co., 566 F.2d 602, 605-06 (8th Cir. 1977).

## C.  Severance of Kehoe and Lee's Trials

Kehoe appeals the district court's denial of his motion to sever his trial from that of co-defendant Lee, arguing that he was prejudiced by the admission of Lee's out-of-court statements.  A district court may sever a trial at its discretion under Rule 14, if either party would be prejudiced by the joinder.  Fed. R. Civ. P. 14; Zafiro v. United States, 506 U.S. 534, 535, 538-39 (1993).  We will reverse a district court's denial of a motion to sever only upon a showing of "real prejudice, which is more

than a showing [that] a separate trial would have improved the likelihood of acquittal." United States v. Gravatt, 280 F.3d 1189, 1991 (8th Cir. 2002). "[I]t will be the rare case, if ever, where a district court should sever the trial of alleged coconspirators." United States v. Frazier, 280 F.3d 835, 844 (8th Cir. 2002) (citing United States v. Patterson, 140 F.3d 767, 774 (8th Cir. 1998)).

We conclude that Kehoe has not shown clear prejudice. Any possibility that testimony regarding Lee would taint Kehoe's trial was minimized by the court's instructions to the jury that each defendant's case be decided based solely on the evidence applied to him. Frazier, 280 F.3d at 844.

### D. Admissibility of Gloria Kehoe's Testimony

Gloria Kehoe testified regarding statements that Daniel Lee had made to her regarding the Mueller murders. She stated that Lee had said that "Bill [Mueller] was one tough son of a bitch because he fought so hard and how dumb Nancy was because she thought it was real and helped put the trash bag on her head because she thought it was real." Lee went on to tell Gloria that Kehoe had paid him a thousand dollars and a rifle for his part in the robbery and murders. Finally, he told Gloria that he and Kehoe had disposed of the bodies by weighing them with rocks and throwing them into the river.

Kehoe argues that the district court erred in allowing Gloria Kehoe to recount the foregoing statements because they do not fall within an exception to the hearsay rule. Kehoe further asserts that because Lee did not testify at trial, Kehoe was denied the right to cross-examine Lee in violation of the Confrontation Clause of the Sixth Amendment. The district court held that Gloria's testimony concerning Lee's statements implicating Kehoe was admissible as nonhearsay, in that those statements constituted adoptive admissions by Kehoe within the meaning of Rule 801(d)(2)(B) of the Federal Rules of Evidence. We review the district court's determinations

-14-

concerning admissibility of evidence for abuse of discretion.  Maddox v. Patterson, 905 F.2d 1178, 1179 (8th Cir. 1990).  We review violations of the Confrontation Clause of the Sixth Amendment for harmless error.  Chapman v. California, 386 U.S. 18, 22-23 (1967); Lufkins v. Leapley, 965 F.2d 1477, 1480 (8th Cir. 1992).

"A statement is not hearsay if [it] is offered against a party and is a statement of which the party has manifested an adoption or belief in its truth."  Fed. R. Evid. 801(d)(2)(B).  For an out-of-court statement to constitute an adoptive admission, the defendant must have been present when the statement was made, have understood it, and have had an opportunity to deny it.  United States v. Disbrow, 768 F.2d 976, 980-81 (8th Cir. 1985) (citing United States v. Lilley, 581 F.2d 182, 187 (8th Cir. 1978)).  Kehoe was present when Lee made the statements to which Gloria Kehoe testified.  The district court found nothing to suggest that Kehoe had not understood Lee's statements.  Kehoe actively participated in the conversation and did not contradict or deny Lee's statements, which were corroborated by the evidence presented in the case and by Kehoe's own, independent confession to Gloria.  Because we conclude that Gloria Kehoe's testimony concerning Lee's statements was not hearsay, there is no Confrontation Clause problem.  United States v. Woods, 301 F.3d 556, 561 (7th Cir. 2002); see also Tennessee v. Street, 471 U.S. 409, 414 (1990) ("The nonhearsay aspect of [the] confession . . . raises no confrontation clause concerns.").  "A major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him."  Bruton v. United States, 391 U.S. 123, 126 (1968).  Lee's statements to which Gloria testified are Kehoe's own because he had adopted them.  He effectively was a witness against himself, thus Gloria's testimony did not violate his rights under the Confrontation Clause.  See Woods, 301 F.3d at 561.

Kehoe also argues that the district court erred in refusing to grant immunity for Lee so that Kehoe could call him to testify regarding these statements.  Lee refused to testify on Fifth Amendment privilege grounds.  We have stated that, assuming a

district court has such authority, granting a defense witness immunity after he has invoked the Fifth Amendment privilege is an "'extraordinary remedy' to be used sparingly and then only where the proffered evidence is 'clearly exculpatory.'" United States v. Blanche, 149 F.3d 763, 767 (8th Cir. 1998). Kehoe has made no showing that Lee's out-of-court statements would be exculpatory; in fact, they strongly inculpate both Lee and Kehoe. Accordingly the district court did not err in refusing to grant immunity to Lee.

### E. Inadequate Corroboration

Kehoe argues that the evidence presented was insufficient to sustain his convictions under Arkansas law because both Gloria's and Cheyne Kehoe's testimony was inadequately corroborated. Arkansas procedural rules generally do not govern a federal trial; they govern here, however, because the government did not object to the jury instructions based upon Arkansas law. United States v. Young, 702 F.2d 133, 136 (8th Cir. 1983). We review de novo questions of state law decided by the district court. Enterprise Leasing Co. v. Metro. Airports Comm'n, 250 F.3d 1215, 1217 (8th Cir. 2001) (citations omitted).

Under Arkansas law, a conviction cannot rest on the testimony of an accomplice unless that testimony is corroborated by other testimony connecting the defendant with the commission of the crime. Ark. Code Ann. § 16-89-111(e)(1); Martin v. Norris, 82 F.3d 211, 214 (8th Cir. 1996); Marta v. State, 983 S.W.2d 924, 927 (Ark. 1999). "The corroborating evidence 'must connect the accused with the crime and be independent of the evidence given by the accomplice.'" Martin, 82 F.3d at 214; see Marta, 93 S.W.2d at 927. Corroborating evidence is sufficient when, "if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. ... Corroborating evidence need not, however, be so substantial in

and of itself to sustain a conviction." Marta, 93 S.W.2d at 927; Martin, 82 F.3d at 214.

Both Gloria and Cheyne Kehoe testified to admissions made by Kehoe concerning his role in the Mueller and Powell murders. Gloria also testified that Kehoe and Kirby were responsible for the 1995 robbery of the Mueller home and that they chose the Muellers as targets because they were part Native American. Gloria led the authorities to several rental storage units containing property that had belonged to the Muellers. Cheyne testified that Kehoe described the murders in detail, revealing that he had killed Sarah Powell because Lee was unable to do so.

To corroborate Gloria's and Cheyne Kehoe's testimony, the government presented evidence that Kehoe and Lee had no money in the days preceding the robbery and murder of the Muellers and Powell and that they were comparatively wealthy a few days later. The duct tape that bound the Muellers and Powell had paint chips imbedded in it that matched the paint on Kehoe's Suburban. Kehoe and Lee also possessed a large amount of the Muellers' property shortly after the murders. Lee's fingerprints were found on a display case that had belonged to Mueller and which was recovered from a storage space rented by Kehoe. Another display case in the same storage space had Bill Mueller's hair in it. Numerous weapons belonging to the Muellers were traced back to Kehoe after they were purchased at gun shows.

Additional evidence indicated that Kehoe and Lee could not account for their whereabouts between January 11 and 14, 1996. Bank and phone records, as well as numerous witnesses, indicate January 11-14 as the time period in which the Muellers and Powell disappeared. The defense presented contrary evidence in the form of witnesses purporting to have seen the Muellers after this time, but the jury did not find this testimony to be credible. "[I]t is the sole province of the jury to weigh the credibility of a witness." United States v. Enriquez, 201 F.3d 1072, 1074 (8th Cir. 2000). Accordingly, we conclude that the corroborating evidence was sufficient to

-17-

raise more than a suspicion of guilt and to support the finding that Kehoe was guilty of the robberies and the murder of the Muellers and Powell.

## F. Psychiatric Evidence

Kehoe also argues that Gloria's testimony was unreliable because of her alleged psychiatric instability. Kehoe argues that the district court abused its discretion by refusing to allow him to present psychiatric expert testimony on this issue. He alleges furthermore that by denying his motion for a compelled psychiatric exam of Gloria the district court impaired his ability to present an adequate defense. We review for abuse of discretion a district court's decision not to order psychiatric examination. United States v. Riley, 657 F.2d 1377, 1387 (8th Cir. 1981). "Ordering a witness to undergo a psychiatric examination is a drastic measure." Id. There was no showing of need for a psychiatric examination of Gloria Kehoe or for testimony concerning her mental state. Accordingly we conclude that the district court did not abuse its discretion in denying Kehoe's motion.

Additionally, Kehoe argues that the district court erred in barring psychiatric testimony concerning a diagnosis based on hypothetical questions. Expert psychiatric testimony based on hypothetical questions or models has been held admissible to evaluate a defendant's future dangerousness in the sentencing phase of a trial. See Barefoot v. Estelle, 463 U.S. 880, 904 (1983). That is far from the circumstances in this case. Kehoe has not presented sufficient evidence to demonstrate the need for psychiatric evidence to impeach Gloria Kehoe's credibility. Accordingly, we conclude that the district court did not abuse its discretion in denying the motion.

## G. Expert Testimony on Handwriting

Kehoe contends that the district court erred in admitting expert testimony regarding handwriting analysis. Expert testimony must be both relevant and reliable

-18-

to be admissible. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)). "The district court is afforded wide latitude in making its reliability and relevance determinations." United States v. Jolivet, 224 F.3d 902, 905 (8th Cir. 2000) (citing Kumho Tire, 526 U.S. at 152). We review the district court's admission of expert testimony for abuse of discretion. Kumho Tire, 526 U.S. at 142; Jolivet, 224 F.3d at 905.

The government acknowledges that the district court erred in stating that the opponent of the evidence bears the burden of excluding the evidence following a Daubert challenge. As the government points out, however, the district court corrected this misstatement. There is no evidence that the evidentiary burden was shifted to Kehoe. The expert, Carl McClary, has examined documents for ten years, belongs to a professional organization in his field, and has lectured on the topic of questioned documents. He explained his methods and process of analysis. The district court did not abuse its discretion in finding McClary's testimony to be reliable. The testimony offered the jury experience and knowledge beyond its own, and thus the district court did not err in admitting it. See Jolivet, 224 F.3d at 906 (holding admission of expert handwriting testimony was proper).

**H. Jury Instructions**

Kehoe alleges several errors with respect to the jury instructions. "We review the district court's jury instructions for abuse of discretion." United States v. Beckman, 222 F.3d 512, 520 (8th Cir. 2000). We affirm if "the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Id. (internal quotes and citations omitted).

Kehoe argues that the district court erred in denying his requested instruction on accomplice testimony. Kehoe's proffered instruction stated that corroboration of

accomplice testimony was required and that the sufficiency of the corroboration was for the jury to determine. In cases where there is evidence corroborating accomplice testimony, there is no need to further admonish the jury to treat such testimony with caution. See United States v. McGinnis, 783 F.2d 755, 758 (8th Cir. 1986). "Decisions as to credibility and as to what weight particular testimony should receive properly rest with the jury." Id. (citing United States v. Evans, 697 F.2d 240, 245 (8th Cir. 1983)). After reviewing the evidence, we conclude that sufficient evidence was offered to corroborate the accomplice witness testimony. The district court thus did not abuse its discretion in declining to give the jury specific cautionary instructions.

Kehoe also argues that the jury instructions were defective because they did not advise the jury that Kehoe could not subpoena Lee and they failed to enumerate the elements of a conspiracy. Because Kehoe made no objection to these instructions at trial, we review them only for plain error. United States v. Holy Bear, 624 F.2d 853, 855 (8th Cir. 1980); Fed. R. Crim. P. 30, 52(b). We conclude that no such error occurred in this case.

## I. Prosecutorial Misconduct

Kehoe argues that the prosecutor committed misconduct in offering his opinion regarding Gloria Kehoe's credibility. In his closing argument, the prosecutor stated,

> I really believe, if [Gloria] could have, would have a lot rather blamed this murder on her husband, Kirby, than her son Chevie. But I think she did what she had to do, which was come in here and tell you folks the truth. If she could have in good conscience blamed Kirby Kehoe, she would have.

Because the defense did not object to this statement at trial, the alleged error was not properly preserved for appellate review. United States v. White, 241 F.3d 1015, 1023

(8th Cir. 2001). We may reverse on this issue only if the error is "plain" and affects the substantial rights of a party. Fed. R. Crim. P. 52(b). "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993) (internal quotes and citations omitted). Although the now-objected to comments may in part have run afoul of the rule that the prosecutor is not permitted to vouch for the truthfulness of a witness, we conclude that they did not rise to the level of plain error. <u>United States v. Jackson</u>, 915 F.2d 359, 361 (8th Cir. 1990).

Kehoe presents several other points of error that we find to be without merit and not deserving of discussion.[4]

## V. CONCLUSION

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]Appellant's motion for leave to file a supplemental brief is denied.